Harley McLAIN, Appellant,

v.

Ben MEIER, individually and in his capacity as Secretary of State, Allen Olson, individually and in his capacity as Governor, Robert Wefald, individually and in his capacity as Attorney General, Rick D. Johnson, individually and in his capacity as Solicitor of the Attorney General, Appellees.

Charles E. PERRY, Appellant,

v.

Ben MEIER, Secretary of State, Nicholas Spaeth, Attorney General, Appellees.

Nos. 86–5290, 86–5386.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1988.

Decided July 8, 1988.

Sterling James Smith, Port Arthur, Tex., for appellants.

Nicholas J. Spaeth, Atty. Gen., Bismarck, N.D., for appellees.

Before LAY, Chief Judge, and McMILLIAN and ARNOLD, Circuit Judges.

McMILLIAN, Circuit Judge.

Harley McLain (No. 86–5290) and Charles E. Perry (No. 86–5386) appeal from final judgments entered in the District Court for the District of North Dakota. In *McLain v. Meier,* Civ. No. A1–84–237 (D.N. D. June 16, 1986) (*McLain*), the district court[1] granted summary judgment in favor of appellees because it concluded that McLain lacked standing to assert his claim under 42 U.S.C. § 1983 that various North Dakota ballot access laws are unconstitutional. In *Perry v. Meier,* Civ. No. A1–86–188, slip op. at 1 (D.N.D. Oct. 15, 1986) (*Perry*), the district court[2] dismissed Perry's claim for a writ of mandamus and for injunctive and declaratory relief regarding the constitutionality of the North Dakota ballot access laws, finding that the laws "are not facially unconstitutional" and "provide liberal access to the ballot." The judgments in *McLain* and *Perry* have been consolidated for appellate review. For reversal, McLain argues that the district court erred in concluding that he lacked standing; Perry argues that the district court erred in dismissing his complaint because the North Dakota ballot access laws are unconstitutional. For the reasons discussed below, we affirm the district court's judgment in *McLain* in part on other grounds, reverse in part, and remand with instructions, and affirm the district court's judgment in *Perry*.

I

We consider McLain's appeal first. Because McLain is no stranger to North Da-

---

1. The Honorable Bruce M. Van Sickle, United States Senior District Judge for the District of North Dakota.

2. The Honorable Patrick A. Conmy, Chief Judge, United States District Court for the District of North Dakota.

kota politics and ballot access laws, a brief review of the historical background of the suit is appropriate. McLain first ran for elective office in North Dakota as an independent candidate for the United States Congress in the November 1978 election. McLain organized the "Chemical Farming Banned" Party during the 1978 election but was unable to garner the required 15,000 signatures by June 1 of the election year in order to appear on the ballot as a candidate of his party. McLain instead qualified as an independent non-party candidate by collecting three hundred signatures before forty days prior to the general election in November. McLain received only 1.5 percent of the votes cast in the general election. He then brought suit challenging the constitutionality of North Dakota's third party ballot access laws.

After the district court dismissed McLain's suit, this court reversed. We concluded that the combined requirements of 15,000 signatures to be collected by June 1, ninety days before the primary election and one hundred and fifty days before the general election, unduly burdened McLain's right of access to the ballot as a third party candidate. *McLain v. Meier,* 637 F.2d 1159, 1162–65 (8th Cir.1980) (*McLain I*). While we noted that McLain had been able to run as an independent candidate, we held that this option was not always a satisfactory alternative to a third party candidacy. *Id.* at 1165.

The North Dakota legislature responded to *McLain I* by enacting more liberal third party ballot access laws. These provisions require only 7,000 signatures to be collected not later than fifty-five days before the primary election. N.D.Cent.Code § 16.1–11–30(4) (1981).[3] North Dakota also moved its primary date from September to June. *Id.* § 16.1–11–01 (1981). At the same time, however, the legislature increased the number of signatures required

to run as an independent candidate for a state-wide office or for President of the United States from three hundred to one thousand, to be collected not later than fifty-five days prior to the general election. *Id.* § 16.1–12–02(5)(a) (1981).[4]

In 1980 McLain unsuccessfully campaigned in North Dakota for the offices of President of the United States and United States Senator from North Dakota. In 1984 McLain again mounted a campaign in North Dakota for the office of President of the United States. Shortly before the 1984 general election, McLain filed his original complaint in this action alleging that the ballot access laws had been made unconstitutionally restrictive by (1) moving the primary date from September to June, thus causing the deadline for third party signatures to be moved from one hundred and fifty days before the general election to two hundred and five days before the general election, and (2) increasing the number of signatures needed to appear on the ballot as an independent candidate for President of the United States from three hundred to one thousand.

McLain subsequently sought leave to file a proposed amended complaint which alleged that (1) the Chemical Farming Banned party had been unable to gain ballot access as a third party for the 1978, 1980, and 1984 general elections; (2) the North Dakota Secretary of State "discouraged" write-in votes during the 1984 general election by failing to provide writing instruments in voting booths; (3) the Secretary of State unlawfully refused to count write-in votes cast in the 1984 general election; (4) the North Dakota election laws unconstitutionally "chill" the formation of new political parties and "maintain" the Republican and Democratic parties; and (5) McLain intended to run for office in 1986.

The district court, noting that McLain was only thirty-three years old when the

---

3. Effective July 1, 1988, the signatures must be collected sixty days prior to the primary election. N.D.Cent.Code § 16.1–11–30(4) (Supp. 1987). This provision is not before us on appeal.

4. In 1985 the number of signatures required to qualify as an independent candidate for President of the United States was increased from one thousand to four thousand. N.D.Cent.Code § 16.1–12–02(5)(c) (Supp.1985). The validity of this amendment is not before the court on appeal.

winner of the 1984 presidential election was inaugurated, concluded that McLain lacked standing to complain of any restrictions on access to the ballot for the Presidency of the United States because to hold that office one must be at least thirty-five years old. *McLain v. Meier*, Civ. No. A1–84–237, slip op. at 7–9 (citing U.S. Const. art. II, § 1). The district court also concluded that none of the allegations in McLain's offered amended complaint would confer standing on him. Accordingly, the district court denied McLain's motion to amend his complaint and entered summary judgment against him and in favor of the officials for the State of North Dakota.

### A

■ We are unable to agree that McLain lacked standing to challenge North Dakota's ballot access laws. The purpose of the standing requirement is to ensure that the parties have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). To this end, the Supreme Court has established that:

> at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982) (citations omitted). Applying this standard to the facts of this case, we conclude that McLain, in his capacity as a *voter*, has sufficiently alleged an injury traceable to the North Dakota ballot access laws which would be redressed if these laws were declared unconstitutional.

McLain's allegations, if true, would cause him injury as a voter because the ballot access laws would restrict his ability to vote for the candidate of his choice or dilute the effect of his vote if his chosen candidate were not fairly presented to the voting public. Although the primary impact of restrictive ballot access laws is on the candidates, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972) (*Bullock*). Additionally, the Supreme Court has noted that the "primary concern is not the interest of [the] candidate ..., but rather, the interests of the voters who chose to associate together to express their support for [his or her] candidacy and the views [he or she] espoused." *Anderson v. Celebrezze*, 460 U.S. 780, 806, 103 S.Ct. 1564, 1579, 75 L.Ed.2d 547 (1983) (*Anderson*). We conclude that McLain has alleged a cognizable injury in fact. It is also clear that McLain's alleged injury can be traced to the North Dakota ballot access laws and that his injury could be redressed by granting the relief he seeks.

Several decisions have found voter standing to challenge ballot access restrictions on the candidate of their choice. *See, e.g., Anderson*, 460 U.S. at 786, 103 S.Ct. at 1568 (supporters of independent candidate have standing to challenge Ohio ballot access laws); *Bullock*, 405 U.S. at 143, 92 S.Ct. at 855–56 (voter has standing to challenge constitutionality of filing fee requirement which directly affects candidate); *Bachur v. Democratic National Party*, 666 F.Supp. 763, 770–72 (D.Md.1987) (voter has standing to assert claims as voter and on behalf of candidates for delegate). We thus conclude that McLain has standing as a voter to assert his claim that the North Dakota ballot access laws are unduly restrictive.

### B

Having concluded that McLain has standing to pursue his claims, we next consider

the merits of his allegations because we may affirm the district court's entry of summary judgment on any basis supported by the record. *Smith v. Mark Twain National Bank,* 805 F.2d 278, 294 n. 25 (8th Cir.1986). McLain's challenge to the North Dakota laws was filed *pro se,* and we construe it to have essentially two components: (1) the third party ballot access laws have been made unduly restrictive by moving the primary from September to June where the required 7,000 signatures must be collected at least fifty-five days before the primary, and (2) the ballot access laws for independent candidates for President of the United States have been unduly restricted by increasing the number of required signatures from three hundred to one thousand and by moving the filing deadlines for the signatures from forty days before the general election to fifty-five days before the general election.

We consider first McLain's challenge to North Dakota's laws regarding third party ballot access. As noted above, a third party seeking ballot access must collect 7,000 signatures at least fifty-five days before the June primary. The most troubling aspect of these requirements is that the signatures are due more than 200 days before the November election. As a result, there exists the danger that third party candidates may be forced to qualify "at a time when the individual's candidacy may be purely potential and contingent upon developments that may occur months later." *McLain I,* 637 F.2d at 1164. This problem is mitigated to a considerable extent, however, by other provisions of the North Dakota election laws which ease the burden imposed by the signature requirements. First, there is no voter registration in North Dakota, so that any United States citizen who has attained the age of eighteen and who has resided in a precinct thirty days may sign a third party petition. North Dakota does not limit the pool of available signatures to those who have not registered as members of another party or to those who have not previously voted in a primary election. Voters need not state any intention to vote for the third party candidate in order to sign a third party petition, and the signatures need not be notarized. Finally, and perhaps most significantly, voters are not limited in the number of different petitions that they may sign, and there are no geographic restrictions as to where the signature may be collected; all 7,000 signatures could be collected in one locality.

In considering McLain's challenge to the third party petition deadline, we review the ballot access scheme in its totality. We look first to whether the laws in question cause a burden "of some substance" on McLain's right to vote; only then do we apply "strict scrutiny" to the statutes and require that they be narrowly drawn to serve a compelling state interest. *McLain I,* 637 F.2d at 116; *see American Party v. White,* 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974) (*American Party*). We conclude that in view of the fact that " 'voting is of the most fundamental significance under our constitutional structure' and requires jealous protection," *McLain I,* 637 F.2d at 1163 (quoting *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979)), requiring 7,000 signatures to be gathered 200 days before the general election is a burden of some substance on McLain's right to vote for the candidate of his choice. The application of the compelling state interest test, however, does not ease the difficulty of this court's inquiry; the Supreme Court has noted that "[c]onstitutional challenges to specific provisions of a state's election laws ... cannot be resolved by any litmus-paper test," *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570, and there is "no substitute for the hard judgments that must be made." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974) (*Storer*). In *Anderson,* the Court set forth a three part inquiry to focus a court's attempts to make these judgments:

> [The court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It must then identify and evaluate the precise inter-

ests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

460 U.S. at 789, 103 S.Ct. at 1570.

We have discussed above the burden on McLain's rights flowing from the difficulty of a third party to demonstrate its support over 200 days before the general election. Indeed, in *McLain I* we found unduly burdensome a filing deadline only 150 days before the general election when coupled with a requirement of 15,000 signatures. Having reduced the signature requirement to only 7,000 signatures, however, North Dakota's earlier filing deadline is considerably less burdensome on putative third party candidates than before.

■ We also find that the State of North Dakota has advanced a more compelling justification for its earlier deadline than was offered in *McLain I*. In *McLain I*, the third party petitions were due ninety days before the primary, a fact which "impresse[d] us as unnecessarily removed from the time of the major parties' most active campaigning." *McLain I*, 637 F.2d at 1164. Here, the early filing deadline is primarily the consequence of rescheduling the primary from September to June. The State offers several reasons for its decision to move the primary to June. First, the State had a low voter turnout in the September primaries, which the State attributes to its agriculturally based economy in which farmers are busy with the fall harvest beginning in August and running through October. Additionally, the September primary did not provide a sufficient amount of time to conduct a recount in the event that a primary vote were contested. Having decided to move the primary to June, the State then set a deadline for third party petitions at fifty-five days before the

primary. According to North Dakota, this time is needed to allow five days in which to verify the signatures on the petitions and to print absentee ballots so they will be available for distribution at least thirty days prior to the primary. We find the justifications advanced by North Dakota to be legitimate and compelling, and the filing deadline for third parties is no more burdensome on McLain's rights than is necessary to support the State's interests.

The difficult task remains of balancing the burden on McLain's rights against the interests advanced by North Dakota in order to determine whether third parties are afforded constitutionally adequate access to the ballot. At the outset, it is clear that the State could easily be second-guessed as to the date for its primary. As with any percentage or numerical requirement, the precise date of the primary is to some extent "necessarily arbitrary." *American Party*, 415 U.S. at 783, 94 S.Ct. at 1307. Once a primary date has been established, "it would probably be impossible to defend it as either compelled or least drastic." *Libertarian Party v. Florida*, 710 F.2d 790, 793 (11th Cir.1983), *cert. denied*, 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984) (*Libertarian Party*). A litigant could always point to a day slightly later that would not significantly alter a state's interests until the point at which primary elections could not be held at all. Accordingly, our inquiry must be one of reasonableness: Do the challenged laws " 'freeze' the status quo by effectively barring all candidates other than those of the major parties," *Libertarian Party*, 710 F.2d at 793, or "could a reasonably diligent [third party] candidate be expected to satisfy the [filing] requirements?" *Storer*, 415 U.S. at 742, 94 S.Ct. at 1285.

Viewing the North Dakota statutes in this light, we conclude that the early filing deadline created by moving the primary election to June will not freeze the status quo, particularly in light of the fact that only 7,000 signatures need be collected. This relatively small number of required signatures significantly abates the difficulties we observed in *McLain I* with requir-

ing third parties to demonstrate support at a time too far removed from the general election. Additionally, the fact that the major parties' primaries will be held in June may serve to heighten interest in the general election at an earlier time. North Dakota clearly has "important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." *Clements v. Fashing,* 457 U.S. 957, 965, 102 S.Ct. 2836, 2844–45, 73 L.Ed.2d 508 (1982) (*Clements* ). We are unable to conclude that requiring third parties to obtain 7,000 signatures fifty-five days before their June primary in order to appear on the ballot as a third party is an unreasonable effort by North Dakota to advance these interests.

### C

■ We next consider McLain's argument that North Dakota's ballot access laws for independent candidates have been rendered unconstitutionally restrictive by increasing the number of required signatures from three hundred to one thousand and moving the filing deadline for the signatures from forty days before the general election to fifty-five days before the general election. We find this claim considerably less troublesome than the third party issue, particularly in view of the fact that, as with third parties, the only limitations on those who may sign a petition are of United States Citizenship and the age of at least eighteen. We do not view the requirement of obtaining 1,000 signatures in order to be printed on the general ballot as an independent candidate to be a significant burden on McLain's right to vote for the candidate of his choice. Indeed, the Court has already indicated that an argument that a statute with a five hundred signature requirement is unduly burdensome "approaches the frivolous." *American Party,* 415 U.S. at 789, 94 S.Ct. at 1310. The Court has repeatedly recognized that

> [t]here is surely an important state interest in requiring some preliminary show-

ing of a significant modicum of support before printing the name of a political organization's candidate on the ballot— the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

*Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971); *see Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 537, 93 L.Ed.2d 499 (1986); *Anderson,* 460 U.S. at 788 n. 9, 103 S.Ct. at 1569–70 n. 9; *Clements,* 457 U.S. at 964–65, 102 S.Ct. at 2844–45; *American Party,* 415 U.S. at 782–83, 94 S.Ct. at 1306–07. North Dakota's requirement of one thousand signatures in order to be printed on the general ballot as an independent candidate is not an unreasonable means of furthering its important interests in election regulation.

### D

■ Having found that McLain has standing to challenge North Dakota's ballot access laws and that these laws are reasonable, we cannot affirm the district court's judgment in its entirety. Insofar as McLain has alleged in his proffered amended complaint that the North Dakota Secretary of State unlawfully refused to count write-in votes cast in the 1984 general election, we conclude that McLain should be allowed to go forward. This allegation is unaffected by our conclusion that North Dakota's ballot access laws are reasonable because the State has an obligation to count all votes properly cast. In view of the liberal rules of amendment contemplated by Fed.R.Civ.P. 15(a), *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), and the district court's erroneous standing analysis which was the basis of the court's denial of leave to amend, we conclude that the district court abused its discretion in denying McLain leave to amend his complaint. We further conclude, however, that this aspect of McLain's proffered amended complaint does not state a federal question so as to confer jurisdiction on the district court to adjudicate this claim. Accordingly, we re-

mand to the district court with instructions to dismiss McLain's proffered amended complaint without prejudice insofar as it alleges that the North Dakota Secretary of State failed to count write-in votes cast in the 1984 general election.[5] McLain is free to pursue this issue in the state courts in a new action.

## II

Turning to Perry's claim that the district court erred in dismissing his complaint because North Dakota's ballot access laws are unconstitutional, we affirm on the basis of the above discussion.

## III

The district court's judgment in *McLain*, No. 86–5290, is affirmed in part on other grounds, reversed in part, and remanded with instructions to allow McLain to amend his complaint in a manner consistent with this opinion. The district court's judgment in *Perry*, No. 86–5386, is affirmed.

5. We emphasize, however, the limited nature of our instructions on remand. We find the remainder of McLain's proffered amended complaint to be either without merit or to be re- solved by our holding that North Dakota's ballot access laws are constitutional. The remainder of McLain's proffered amended complaint should be dismissed with prejudice.