SOCIALIST WORKERS PARTY, George Richard McBride, James Kenneth Gotesky, Elvena Elizabeth Brady, Cleve Andrew Pully, and Toba Leah Singer, Plaintiffs,

v.

Ken HECHLER, in his official capacities as Secretary of State of West Virginia and Member, State Election Commission Office of Secretary of State; Allan Hammock, in his official capacity as Member, State Election Commission Office of Secretary of State; Barbara Ruley, in her official capacity as Member, State Election Commission Office of Secretary of State; Ben Bryant, in his official capacity as Member, State Election Commission Office of Secretary of State; and Perry Reed, in his official capacity as Member, State Election Commission Office of Secretary of State, Defendants.

Civ. A. No. 2:88–0499.

United States District Court,
S.D. West Virginia,
Charleston Division.

Sept. 13, 1988.

Stephen R. Fielder, Shepherdstown, W. Va., Clinton W. Smith, Charleston, W. Va., for plaintiffs.

Robert E. Wilkinson, Sp. Asst. Atty. Gen., Charleston, W. Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the cross motions for summary judgment filed by defendants Ken Hechler, Allan Hammock, Barbara Ruley, Ben Bryant and Perry Reed, and by the plaintiffs Socialist Workers Party, George Richard McBride, James Kenneth Gotesky, Elvena Elizabeth Brady, Cleve Andrew Pully and Toba Leah Singer.

### 1. *Background*

On April 13, 1988, plaintiffs filed a complaint against the defendants seeking declarative and injunctive relief from the restraints of certain sections of the West Virginia election laws which plaintiffs allege as being unconstitutional. Plaintiffs include the Socialist Workers Party, its chairman, Cleve Pully, and Toba Singer, a duly registered voter of the State of West Virginia who desires to vote for Socialist Workers Party candidates in the November 1988 general election. The remaining plaintiffs are party members who seek to run for public office in that election, namely, George McBride, candidate for United States Senator, James Gotesky, candidate for United States Representative for the Third Congressional District, and Elvena Brady, candidate for Secretary of State of West Virginia. Defendants filed a motion for summary judgment. Plaintiffs filed a response and cross motioned for summary judgment. The parties filed a stipulation of facts on July 1, 1988, and have filed memoranda in support of their respective positions. There are no factual disputes on the record. Accordingly, the court will rule upon the purely legal question of whether certain sections of the West Virginia election laws are constitutional.

### 2. *Discussion*

Plaintiffs contend that Sections 3–5–8a, 3–5–23(a), (c), (d), and 3–5–24 of the West Virginia Code individually and collectively deprive plaintiffs of their political association and free speech rights in violation of the First and Fourteenth Amendments to the United States Constitution.[1] West Virginia has in place comprehensive election laws regulating the procedure for independent and third party candidates to obtain ballot access. Political parties polling less than 10% of the total vote cast for governor at the immediately preceding general election may obtain access to the ballot by following the procedures outlined in § 3–5–23 for groups of citizens having no party organization or by nominating candidates at party conventions and submitting certificate nominations, commonly referred to as nominating petitions, in accordance with § 3–5–24. *See* W.Va.Code § 3–5–22. Under § 3–5–23, groups of citizens having no party organization must submit both a declaration of candidacy and nominating petitions. The declaration of candidacy must be filed no later than 31 days before the primary election. § 3–5–23(a). The nominating petitions must total no less than 1% of the total vote cast at the last general election for the office sought. § 3–5–23(c). The filing date for these petitions is no later than the day before the

---

**1.** The Supreme Court has not drawn a clear line between its equal protection and due process analyses in this area. In *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Court noted:

In this case, we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis. We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause

of the Fourteenth Amendment. These cases, applying the "fundamental rights" strand of equal protection analysis, have identified the First and Fourteenth Amendment rights implicated by restrictions on the eligibility of voters and candidates, and have considered the degree to which the State's restrictions further legitimate state interests.

*Id.* at 786–87 n. 7, 103 S.Ct. at 1568–69 n. 7 (citations omitted).

primary election is held. § 3–5–24. Candidates running for the offices of president and vice president must submit a declaration of candidacy no later than July 2, and submit nominating petitions no later than August 1. § 3–5–23(a). No limits are placed upon the date when candidates may begin collecting petitions. Nominating petitions must be signed by duly registered voters of the State of West Virginia. § 3–5–23(c). Voters who sign the petitions forfeit their right to vote in the primary. § 3–5–23(d).

Candidates must pay a filing fee equivalent to 1% of the annual salary for the office sought. § 3–5–8a. Candidates who are unable to pay this amount may submit in-lieu-of-filing-fee petitions. § 3–5–8a. The number of signatures required is four qualified voters per each whole dollar. *Id.* The number of submitted petitions must be enough to waive the fee in whole; waiver in part is not permissible. *Id.* The signatures may be collected from the second Monday in January down to the date of submission which is 31 days prior to the primary. §§ 3–5–8a, 23(a). Voters are free to sign fee petitions and vote in the primary. § 3–5–8a. Candidates running for the offices of president and vice president must submit their fee petitions along with their declaration of candidacy no later than July 2. § 3–5–23(a).

The Supreme Court has recognized that under the First and Fourteenth Amendments, individuals enjoy the right to associate for political purposes, as well as the right of qualified voters to cast their votes effectively. *See Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). Restrictions upon the access of political parties to the ballot infringe upon these freedoms. However, as the Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), observed:

> [N]ot all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates. We have recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest

and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 [94 S.Ct. 1274, 1279, 39 L.Ed.2d 714] (1974). To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

*Id.* at 788, 103 S.Ct. at 1569 (footnote omitted). In a footnote, the Court stated:

> We have upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself. The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates.

*Id.* at 788–89 n. 9, 103 S.Ct. at 1569–70 n. 9 (citations omitted). To aid lower courts in distinguishing permissible from impermissible ballot restrictions, the Court established the following standard:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. *Storer, supra,* [415 U.S.] at 730 [94 S.Ct. at 1279.] Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for

the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789, 103 S.Ct. at 1570. *See Libertarian Party of Virginia v. Davis,* 766 F.2d 865, 867 (4th Cir.1985), *cert. denied,* 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986) (court applied balancing test set out in *Anderson* in upholding challenge to Virginia election laws requiring submission of petitions totalling .5% of all registered voters).

## I.

■ Turning now to the statutory provisions in question, plaintiffs attack the validity of the state's statutory edict that forces voters under § 3–5–23(d) into a choice between signing a nominating petition and voting in the primary.[2] In *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), the Supreme Court upheld the constitutionality of a similar provision in the Texas Election Code. The Court noted:

> We think the three-judge District Court in *Jackson v. Ogilvie,* 325 F.Supp. 864, 867 (ND Ill.), aff'd, 403 U.S. 925 [91 S.Ct. 2247, 29 L.Ed.2d 705] (1971), aptly characterized the situation in upholding a state election law provision preventing a voter from both voting in the primary and signing an independent election petition:

"Thus, the state's scheme attempts to ensure that each qualified elector may in fact exercise the political franchise. He may exercise it either by vote or by signing a nominating petition. He cannot have it both ways."

... At least where, as here, the political parties had access to the entire electorate and an opportunity to commit voters on primary day, we see nothing invidious in disqualifying those who have voted at a party primary from signing petitions for another party seeking ballot position for its candidates for the same offices.

*Id.* at 785–86, 94 S.Ct. at 1308 (footnote omitted). *See Tashjran v. Republican Party of Connecticut,* 479 U.S. 208, 224 n. 13, 107 S.Ct. 544, 554 n. 13, 93 L.Ed.2d 514 (1986); *Anderson,* 460 U.S. at 802 n. 29, 103 S.Ct. at 1577 n. 29. Applying the reasoning of the Court in *American Party,* the court concludes that § 3–5–23(d), prohibiting voters who sign nominating petitions from voting in the primaries, does not infringe upon the constitutional rights of plaintiffs. *See also West Virginia Libertarian Party v. Manchin,* 165 W.Va. 206, 270 S.E.2d 634 *appeal dismissed, Citizens Party v. Manchin,* 449 U.S. 802, 101 S.Ct. 46, 66 L.Ed.2d 5 (1980), wherein the West Virginia Supreme Court of Appeals sustained the validity of § 3–5–23(d) against constitutional attack. *Id.* 270 S.E.2d at 646–48.

■ Plaintiffs assert that § 3–5–23(d), by requiring a public declaration of voting or intention to vote, is unconstitutional.[3] Plaintiffs argue that if voters were required under § 3–5–23(d) to publicly declare their desire to vote for the named candidate in the general election, such a

---

**2.** Section 3–5–23(d) provides in pertinent part:
  The secretary of state shall prescribe the form and content of the nomination certificates to be used for soliciting signatures. The content shall include the language to be used in giving written and oral notice to each voter that signing of the nominating certificate forfeits that voter's right to vote in the corresponding primary election.

**3.** Section 3–5–23(d) prescribes that:
  Such certificates shall state the name and residence of each of such candidates; that he

is legally qualified to hold such office; that the subscribers are legally qualified and duly registered as voters and desire to vote for such candidates; ...
  The secretary of state shall prescribe the form and content of the nomination certificates to be used for soliticing signatures. The content shall include the language to be used in giving written and oral notice to each voter than signing of the nominating certificate forfeits that voter's right to vote in the corresponding primary election.

requirement would be unconstitutional. *See Anderson v. Mills,* 664 F.2d 600, 608–09 (6th Cir.1981). The court, however, interprets § 3–5–23(d), read as a whole, to require only a public declaration that the voter desires the nominating petition to take the place of his otherwise valid right to vote in the primary. As such, the stated desire by the voter operates as a necessary corollary to ensure that the voter is aware that he is giving up his right to vote in the primary, a ballot restriction that the Court has already upheld on numerous occasions as reasonable and nondiscriminatory. *See American Party,* 415 U.S. at 778, 94 S.Ct. at 1304 (Court upheld requirement in Texas that voters signing petitions sign an oath that they are registered voters and have not participated in any other party's nominating or qualification proceedings).

■ Section 3–5–23(c) states that "[t]he number of such signatures shall be equal to not less than one percent of the entire vote cast at the last preceding general election for the office in the state, district, county or other political division for which the nomination is to be made." Plaintiffs contend that the one percent requirement impermissibly burdens their rights to cast ballots effectively. A similar argument was rejected in *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), where the Court refused to invalidate a requirement under Georgia law that independent and minor party candidates submit nominating petitions totalling five percent of the votes cast in the previous election for the specific office sought in order to have their names placed on the

ballot. *Id.* at 442, 91 S.Ct. at 1976. *See Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) (1% requirement upheld); *American Party,* 415 U.S. 767, 94 S.Ct. 1296 (1974) (same). In upholding the 5% requirement, the Court in *Jenness* reasoned:

> There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

*Jenness,* 403 U.S. at 442, 91 S.Ct. at 1976. The requirement in West Virginia that plaintiffs compile one percent nominating petitions, no less than Georgia's stricter five percent requirement, plainly withstands constitutional attack.

## II.

■ Plaintiffs next contend that a combination of the pre-primary filing deadlines for declaration of candidacy[4] and submission of nominating petitions,[5] coupled with the forced choice voters must make under § 3–5–23(d) to sign their petition or vote in the primary, constitutes an unconstitutional restriction on their access to the general election ballot in West Virginia. In evaluating this contention, the overall election scheme must be considered to determine whether ballot access has been impermissibly restricted. *Libertarian Party of Missouri v. Bond,* 764 F.2d 538 (8th Cir.1985).[6]

---

**4.** Section 3–5–23(a) stipulates the time for filing declaration of candidacy:

> Groups of citizens having no party organization may nominate candidates for public office otherwise than by conventions or primary elections. In such case, the candidate or candidates, jointly or severally, shall file a declaration with the secretary of state if the office is to be filled by the voters of more than one county ...; such declaration to be filed at least thirty days prior to the time of filing the certificate provided by section twenty-four [§ 3–5–24] of this article.

**5.** Section 3–5–24 prescribes the time for submission of nominating certificates or petitions as follows:

All certificates nominating candidates for office under the preceding section [§ 3–5–23], including a candidate for the office of presidential elector, shall be filed, in the case of a candidate to be voted for by the voters of the entire state or by any subdivision thereof other than a single county, with the secretary of state, ... not later than the day preceding the date on which the primary election is held. After such date no such certificate shall be received by such officers.

**6.** The Eighth Circuit observed in *Libertarian Party of Missouri,* at 541:

> It has been recognized, however, that the entire election scheme must be analyzed to determine whether undue constraints on ac-

The defendants rely on the analysis and holding in *West Virginia Libertarian Party v. Manchin*, 270 S.E.2d 634 (W.Va.1980), wherein the West Virginia Supreme Court of Appeals sustained a constitutional challenge to identical provisions of the election laws. The reasoning of the *Manchin* decision in upholding the constitutionality of the West Virginia early filing deadline is to some extent undercut by subsequent holdings of the United States Supreme Court. Three years after *Manchin* was decided, the Court in *Anderson* struck down a similar Ohio preprimary filing deadline, as applied to Independent presidential candidate John Anderson.[7] In ·response to the *Anderson* decision, the West Virginia Legislature amended § 3-5-23(a) in 1986 to add "[p]rovided, That the deadline for filing the certificate for persons seeking ballot access as a candidate for the office of president or vice president shall be filed not later than the first day of August preceding the general election." The preprimary deadline requirements for all other elective offices were left intact by the legislature. Defendants argue that the holding of *Anderson* is limited to ballot restrictions on independent and third party candidates running for president or vice president and is necessitated by the circumstance that the two major political parties do not select their nominees for those offices until the holding of their national party conventions in July and August.

The Court in *Anderson* relied upon several factors uniquely present in the context of a national election in striking down Ohio's early filing deadline. For example, the Court stressed the disadvantages third party and independent candidates faced in Ohio by having to declare their candidacies and begin to muster support five months before the major parties hold their conventions to adopt the chosen nominees and formulate party platforms. *See Anderson*, 460 U.S. at 790–91, 103 S.Ct. at 1570–71, where the Court noted:

> Ohio's filing deadline prevents persons who wish to be independent candidates from entering the significant political arena established in the State by a Presidential election campaign—and creating new political coalitions of Ohio voters—at any time after mid to late March. At this point developments in campaigns for the major-party nominations have only begun, and the major parties will not adopt their nominees and platforms for another five months. Candidates and

cess to the ballot exist. *See, e.g., Mandel v. Bradley*, 432 U.S. 173, 178, 97 S.Ct. 2238, 2241, 53 L.Ed.2d 199 (1977) (features of electoral system other than filing deadline, such as period of time to collect signatures and restrictions on pool of potential petition signers, must be considered); *Storer v. Brown, supra*, 415 U.S. at 738–39, 94 S.Ct. at 1283 (case remanded to analyze effect of 24–day period to collect signatures and effect of reduction of pool of potential signers by disqualification of those who had voted in the primary); *Williams v. Rhodes, supra*, 393 U.S. at 34, 89 S.Ct. at 12 ("totality of the Ohio restrictive laws taken as a whole" convinced Court to invalidate 15 percent signature requirement); *McLain v. Meier, supra*, 637 F.2d at 1164 ("facial validity of a signature requirement is but one indication of the constitutionality of a state's access provisions"; early filing deadline convinced court that 3 percent signature requirement was unconstitutional). *Id.* at 541.

7. In one sense, the Ohio statute at issue in *Anderson* is more burdensome than the West Virginia statute. Ohio required all independent candidates for statewide office to submit no later than 75 days before the primary a declaration of candidacy and nominating petitions. *Anderson*, 460 U.S. at 783 n. 1, 103 S.Ct. at 1567 n. 1. The West Virginia statute requires independent and third party candidates to submit no later than 31 days before the primary a declaration of candidacy and no later than the day before the primary the nominating petitions. But in another sense, the Ohio statute is less burdensome than the West Virginia statute. Candidates in Ohio are required to submit nominating petitions totalling no less than 5,000 and no more than 15,000 signatures. Although the Court in *Anderson* did not break down the required 5,000 votes into a percentage of votes cast in the last presidential election, the district court calculated the percentage to be .12%. *See Anderson v. Celebrezze*, 449 F.Supp. 121, 124 (S.D.Ohio 1980). Even if it were the case that only half as many voters participated in other statewide elections in Ohio, the required percentage would amount to but .24%. West Virginia requires 1%. Nevertheless, the two statutes are similar in the sense that both involve preprimary filing deadlines, a condition which the Court disavowed in *Anderson* with respect to presidential candidacies.

supporters within the major parties thus have the political advantage of continued flexibility; for independents, the inflexibility imposed by the March filing deadline is a correlative disadvantage because of the competitive nature of the electoral process.

(Footnote omitted). Third party and independent candidates running for statewide and local elections in West Virginia are not disadvantaged in having to anticipate the outcome of the major party conventions occurring five months down the road because the major parties do not hold conventions for statewide and local elections in West Virginia. Indeed, third party and independent candidates are at an advantage in West Virginia by generally being afforded a later filing deadline to declare their candidacies than major party candidates. Compare § 3–5–23(a) (third party and independent candidates must file declaration of candidacy thirty-one days prior to primary) *with* § 3–5–7 (major party candidates must file declaration of candidacy "not earlier than the second Monday in January next preceding the primary election day, and not later than the first Saturday of February next preceding the primary election day").

Further, by placing the deadline for submission of nominating petitions on the day before the primary, all potential candidates are placed on an equal footing in having to clamor for support during the same period of time before the primary election. *See Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986). The Washington election laws at issue in *Munro* allowed third party and independent candidates declaring their candidacies approximately two months before the primary election to automatically have their names placed on the ballot in the primary election. Only those candidates receiving at least 1% of the primary vote were eligible to have their names placed on the general election ballot. In sustaining the constitutionality of the Washington election scheme, the Court emphasized that states have always been able to require third party and independent candidates to demonstrate a modicum of community sup-

port in order to have their names placed on the general election ballot. The court concluded that requiring third party and independent candidates to make this showing prior to the primary by competing with the major party candidates on an equal footing to "get the vote out" does not unduly restrict access to the ballot. *See Munro,* 107 S.Ct. at 539.

Next, the Court in *Anderson* was concerned with the interdependency of the various election laws of the states in restricting ballot access of those candidates running for national office. The Court noted:

> [I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interests. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation. Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.

*Anderson,* 460 U.S. at 794–95, 103 S.Ct. at 1572–73 (footnotes omitted). Ballot restrictions placed upon third party and independent candidates running for statewide and local elections in West Virginia do not affect the outcome of elections held in sister states.

Further, *Anderson* involved a challenge by an independent candidate. In *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), the Court drew a distinction between independent and third party candidates in that "[a] new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office."

*Storer*, 415 U.S. at 745, 94 S.Ct. at 1286. The Eleventh Circuit in *Libertarian Party of Florida v. State of Florida*, 710 F.2d 790 (11th Cir.1983), *cert. denied*, 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984), relied upon *Storer* to justify imposing harsher restrictions on third party candidates so as to provide "assurance that the particular party designation has some meaning." *Id.* at 795.

The court finds on balance significant differences between national and statewide and local elections sufficient to preclude extending the holding of *Anderson* to statewide and local elections. *See Rainbow Coalition v. Oklahoma State Election Board*, 844 F.2d 740, 746 n. 9 (10th Cir.1988); *Stevenson v. State Board of Elections*, 638 F.Supp. 547, 552 (N.D.Ill. 1986), *aff'd*, 794 F.2d 1176 (7th Cir.1986); *Dart v. Brown*, 717 F.2d 1491, 1503 (5th Cir.1983), *cert. denied, Libertarian Party of Louisiana v. Brown*, 469 U.S. 825, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984) ("The Court [in *Anderson*] was divided five to four, and the majority placed heavy emphasis on the strong national, and diminished state, interest in presidential elections").[8]

Although the holding of *Anderson* is limited to the context of a national election, the balancing test set forth in *Anderson* has been universally applied by lower courts in evaluating all challenges to election schemes restricting ballot access of third party and independent candidates running in national, statewide and local elections. As the Court stated, constitutional challenges to state election laws "cannot be resolved by any litmus-paper test." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570. Accordingly, lower courts have applied a three-step analysis whereby the character and magnitude of the challengers' asserted interests are assessed, the interests put forward by the state to justify the burdens imposed are identified and evaluated, and the state's interest in a valid election system is measured against the necessity of burdening the challengers' right to run. *Id.*

Applying this analysis, it is stipulated that in the current election year, plaintiff McBride, seeking office as United States Senator, was required to file 7,222 nominating petitions; plaintiff Gotesky, seeking office as a United States Representative for the Third District, was required to file 1,135 nominating petitions; and plaintiff, Brady, seeking office as Secretary of State, was required to file 6,816 nominating petitions. In all challenges to ballot restrictions, the court in determining the overall burden placed upon candidates attempting to collect the prescribed number of signatures must consider the pool of available signers, the amount of time in which the signatures can be obtained, and the date of the filing deadline. *See Developments*, 88 Harv.L.Rev. at 1125 (1975).

West Virginia restricts the pool of available signers to registered voters who do not vote in the primary. This restriction is not an unusual one. The Supreme Court has upheld the constitutionality of election schemes forcing voters to choose between signing nominating petitions and voting in the primary. *See American Party*, 415 U.S. at 785–86, 94 S.Ct. at 1308–09.[9] The

---

**8.** In *Cripps v. Seneca County Board of Elections*, 629 F.Supp. 1335 (N.D.Ohio 1985), the district court relied upon the Sixth Circuit's decision in *Goldman–Frankie v. Austin*, 727 F.2d 603 (6th Cir.1984), in refusing to restrict the principles set forth in *Anderson* to only national elections. *Cripps*, 629 F.Supp. at 1298. However, the district court's reliance on *Austin* is questionable. The Sixth Circuit in *Austin* found that the total exclusion of access to the ballot by an independent candidate running for local school board election was invalid. *Austin*, 727 F.2d at 607. The defendants in *Austin* had argued that the prior decision by the Supreme Court in *McCarthy v. Briscoe*, 429 U.S. 1317, 97 S.Ct. 10, 50 L.Ed.2d 49 (1976), striking down the Michigan

election laws for failing to provide ballot access to Eugene McCarthy running as an independent candidate for United States Senator, was not controlling because it involved a challenge by an independent candidate running for a federal office. *Id.* at 606–07. The court rejected limiting the Supreme Court's decision to federal elections, *id.*, without discussing the *Anderson* decision or the important differences between national and statewide elections relied upon by the Court in *Anderson*.

**9.** Although the Court in *American Party* upheld the Texas provision requiring voters to choose between signing nominating petitions and voting in the primary, Texas, unlike West Virginia,

restriction cannot be properly evaluated without reference to its effects on the pool of available voters. In the eleven presidential year primary elections in West Virginia from 1948 to 1988, the highest percentage of registered voters who voted in the primary was approximately 55%; the lowest was some 43%; and the average was approximately 52%. *See* Defendants' Exhibit 1 and stipulation by the parties at hearing of August 31, 1988. In practical terms, third party and independent candidates on average would have a pool of available signers in any given election year to collect signatures from nearly one-half of the registered voters.

The deadline for submission of nominating petitions is restricted in West Virginia to the day before the primary. Courts have upheld election laws with more restrictive deadlines for submission of nominating petitions than found in the West Virginia election laws. *See McLain v. Meier,* 851 F.2d 1045 (8th Cir.1988) (deadline 55 days before primary upheld); *Rainbow Coalition,* 740 F.2d at 744–47 (deadline 90 days before the primary upheld); *Libertarian Party of Missouri,* 764 F.2d at 542 (deadline one week before the primary upheld); *Stevenson,* 638 F.Supp. at 552–54 (deadline 92–99 days before primary upheld).

In *Stoddard v. Quinn,* 593 F.Supp. 300 (D.Me.1984), the district court struck down a requirement under Maine election laws that nominating petitions be submitted 40 days prior to the primary. *Id.* at 307. But unlike the West Virginia election laws, Maine limited the time during which signatures could be collected to the period from January 1 to April 1, "a time when adverse weather conditions prevail in Maine." *Id.* at 304. More importantly, as the election draws nearer, voter interest heightens, making the thirty days before the primary a crucial period where voter interest is at its highest and correspondingly a candidate's chances to gather signatures during this period are significantly enhanced. By setting the deadline forty days before the primary, Maine in contrast to West Virginia takes this critical period away from its third party and independent candidates clamoring for a place on the ballot. Similarly, the district court's opinion in *Cripps,* striking down Ohio's preprimary deadline, is distinguishable from the West Virginia election laws in that Ohio, like Maine, forced its third party and independent candidates to gather signatures 75 days before the primary at a time when "[v]olunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign." *Anderson,* 460 U.S. at 792, 103 S.Ct. at 1571 (footnote omitted).[10]

West Virginia does not restrict the period of time in which to commence the collection of petitions. Yet, courts have upheld election laws restricting the period of time in which to gather petitions. *See American Party,* 415 U.S. at 786, 94 S.Ct. at 1308 (candidates had 55 days to collect petitions); *Jenness,* 403 U.S. at 433, 91 S.Ct. at 1971 (candidates limited to 180 days to collect petitions); *Libertarian Party of Florida,* 710 F.2d at 794 (candidates limited to 188 days to collect petitions).

In order to adequately assess the overall burden imposed under the West Virginia election laws, it is important to consider the number of signatures required in terms of a percentage as well as the raw number itself. West Virginia requires signatures from registered voters totalling 1% of the votes cast in the last election for the specific office sought. Courts have upheld election laws requiring the gathering of similar or higher percentages of signatures. *See Munro,* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) (1% requirement upheld); *American Party,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (1% re-

---

did not impose the additional burden of forcing candidates to collect the signatures before the primary. *American Party,* 415 U.S. at 784, 94 S.Ct. at 1307.

**10.** The district court opinion in *LaRouche v. Burgio,* 594 F.Supp. 614 (D.N.J.1984), is likewise inapposite in that *LaRouche* involved striking down New Jersey's filing deadline as applied to third party and independent candidates running for national office. *Id.* at 616.

quirement upheld); *Jenness,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (5% requirement upheld); *Storer,* 415 U.S. 724, 91 S.Ct. 1970, 39 L.Ed.2d 714 (1974) (5% requirement upheld); *Rainbow Coalition,* 844 F.2d 740 (10th Cir.1988) (5% requirement upheld); *Hall v. Simcox,* 766 F.2d 1171 (7th Cir.1985) (2% requirement upheld); *Libertarian Party of Florida,* 710 F.2d 790 (11th Cir.1983) (3% requirement upheld).

In terms of raw numbers, the largest amount of signatures required to be collected by any of the plaintiffs comes to no more than the 7,222 petitions needed for the office of United States Senator. In *McLain,* the Eighth Circuit described a similar requirement in North Dakota, a less populated state than West Virginia, of collecting 7,000 signatures as a "relatively small number of required signatures." In *Hall,* the Seventh Circuit found Indiana's requirement of 22,000 signatures much less burdensome than Florida's requirement of 140,000 signatures upheld in *Libertarian Party of Florida,* or Texas' requirement of 35,000 signatures upheld in *American Party.* The court concluded:

> Of course in one sense the more populous the state, the easier it is to get signatures—there is a larger pool to fish from. On this theory only the percentage should matter, a proposition for which *McLain,* which invalidated a requirement of only 15,000 signatures, offers some support. But this overlooks a number of things: it costs money to circulate petitions; the more signatures that are required, the higher the cost is; and minor parties usually are strapped for funds.

*Hall,* 766 F.2d at 1174.

Further, West Virginia imposes no geographical restrictions on where the voters signing the petitions must reside. *See Libertarian Party of Missouri,* 746 F.2d at 542–43 (Eighth Circuit upheld Missouri's requirement of collecting petitions from 1% of voters in each congressional district or 2% of voters from half of the districts); *Libertarian Party of Virginia v. Davis,* 766 F.2d at 868–69 (Fourth Circuit upheld Virginia's requirement of collecting petitions from 200 voters in each congressional district).

■ While it is also true that some courts after *Anderson* have upheld the constitutionality of preprimary filing deadlines, in none of those cases were the respective courts faced with the additional burden imposed under West Virginia law of forcing voters to choose between signing petitions or voting in the primary. The absence of this added burden was a factor upon which those courts relied in denying the constitutional challenge. *McLain,* 851 F.2d at 1049; *Rainbow Coalition,* 844 F.2d at 745–46; *Libertarian Party of Missouri,* 764 F.2d at 542. Consequently, it appears that plaintiffs' associational rights are to some significant extent burdened by the West Virginia preprimary deadlines when coupled with the forced choice of voters.[11] Thus, under *Anderson,* the state must justify the burden.

■ To carry the burden, the defendants assert that requiring all third party and independent candidates to declare their candidacies and submit nominating petitions before the primary helps to ensure that voters are exposed to the full field of candidates and their positions on the issues during the primary election season so as to vote intelligently at the primary polls. The asserted interest of the state in ensuring a full field of candidates and positions during the primary season is a legitimate one.[12]

11. Only seven such individuals qualified to be placed on the presidential ballot in the last fifty years. *See* Note, *Ballot Access Laws in West Virginia—A Call for Change,* 87 W.Va.L.Rev. 809, 820 (1985).

12. The second asserted interest of the state is to combat "intraparty" fueding and promote political stability. The Court in *Anderson* noted:

> More generally, the early filing deadline is not precisely drawn to protect the parties from "intraparty feuding," whatever legitimacy that state goal may have in a Presidential election. If the deadline is designed to keep intraparty competition within the party structure, its coverage is both too broad and too narrow. It is true that in this case § 3513.15.7 was applied to a candidate who had previously competed in party primaries

Added to this legitimate interest, the United States Supreme Court has long recognized the important state interest in requiring third party and independent candidates to make a preliminary showing of significant support before being placed as a candidate on the state's general election ballot. *See Munro,* 107 S.Ct. at 537. As the Court in *Jenness* stated:

There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

*Jenness,* 403 U.S. at 442, 91 S.Ct. at 1976. Further, in evaluating these state interests, the Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro,* 107 S.Ct. at 537.

■■■ The final task remains of balancing the burdens on the rights of the challengers in securing a place on the general election ballot against the interests of West Virginia in requiring some initial modicum of community support in order to determine whether third parties are offered constitutionally adequate access to the ballot. The task is not one of second-guessing the wisdom of the particular bundle of election scheme procedures and restrictions chosen by the state; surely, the procedures and restrictions contained in any such scheme are to some extent necessarily arbitrary.[13] Rather, the question becomes one of reasonableness. As observed in *McLain,* the court must determine whether:

[T]he challenged laws "freeze the status quo by effectively barring all candidates other than those of the major parties," Libertarian Party, 710 F.2d at 793, or "could a reasonably diligent [third party] candidate be expected to satisfy the [filing] requirements?" *Storer,* 415 U.S. at 742, 94 S.Ct. at 1285.

851 F.2d at 1050. It appears that the burdens placed upon the challengers under West Virginia election laws are not great. In the current election year, the largest number of signatures to be collected amounted to 7,222. Approximately 54% of the registered voters cast ballots this year in the West Virginia primary. Thus, even with the forced choice imposed upon voters

and then sought to run as an independent. But the early deadline applies broadly to independent candidates who have not been affiliated in the recent past with any political party. On the other hand, as long as the decision to run is made before the March deadline, Ohio does not prohibit independent candidacies by persons formerly affiliated with a political party, or currently participating in intraparty competition in other States—regardless of the effect on the political party structure.
*Anderson,* 460 U.S. at 805, 103 S.Ct. at 1578. The Court's reasoning in *Anderson* applies with equal force to the claim by the state of combatting intraparty feuding.

Another asserted state interest is the administrative concerns in having to certify the validity of the submitted petitions. Although the state has a legitimate interest in providing itself a sufficient amount of time to certify the petitions, the state has not justified setting the time far in advance of the general election. Indeed, under § 3–5–23(a) the state allows third party and independent candidates running for the offices of president and vice president to submit petitions no later than August 1.

13. Under the West Virginia election scheme, third party and independent candidates are in some respects treated more favorably than major party candidates and less so in others. For example, third party and independent candidates are permitted to file their declarations of candidacy as well as submit their fee petitions several months later than major party candidates. §§ 3–5–7, 3–5–8a and 3–5–23(a). On the other hand, political parties polling at least one per cent of the total vote for governor at the last preceding general election may fill vacancies as late as sixty days prior to the general election and, in the event of the death of a nominee, as late as twelve days. §§ 3–5–8, 3–5–19. The parties have not submitted any evidence on the number of vacancies occurring and filled under § 3–5–19 from time to time for the offices of Secretary of State, United States Senator and United States Representative for the Third Congressional District. It is noted that a vacancy on the Republican ticket for Secretary of State in this year's general election remains unfilled after the last day expired on September 9, 1988.

in West Virginia, the challengers still had 46% or some 435,000 registered voters from which to solicit signatures. See Defendants' Exhibit No. 1. It is likely that this large pool of 435,000 nonvoters would likely include a substantial number of individuals who would have been reluctant to surrender their right to vote in the primary by signing a nominating petition, at least until they were certain that they would not be casting a ballot on primary day. Yet, the potential pool upon which a challenger may draw remains quite large in relation to the number of signatures needed. Indeed, the challengers made no effort to collect signatures and thus failed in that regard to comply with the "reasonably diligent candidate" standard of *Storer*.[14] *Libertarian Party of Florida*, 710 F.2d at 794.

West Virginia has an important interest in requiring third party and independent candidates to demonstrate a modicum of community support before placing their names on its general election ballot. In balancing this strong state interest against the diminished burden placed upon the challengers under the state's election laws, collecting the relatively modest number of signatures required is not, in view of the totality of the design of the laws of West Virginia governing ballot access, an unreasonable imposition nor does it freeze the status quo.

### III.

Plaintiffs attack the preprimary deadline for in-lieu-of-filing-fee petitions as unconstitutional.[15] The seminal Supreme Court decision on filing fees is *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), where the Court was confronted with a challenge to California's filing fee provision as exclusionary for failing to provide an alternative for those candidates seeking ballot access who were unable to pay the fee. The Court recognized on the one hand that states have a legitimate interest in "protecting the integrity of the electoral system from the recognized dangers of ballots listing so many candidates as to undermine the process of giving expression to the will of the majority." *Id.* at 714, 94 S.Ct. at 1319. However, candidates unable to pay a fee have a legitimate interest in gaining ballot access. In order to accommodate these two conflicting interests, the Court observed:

> Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests. Accordingly, we hold that in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay.

> In so holding, we note that there are obvious and well-known means of testing the "seriousness" of a candidacy which do not measure the probability of attract-

---

**14.** In the upcoming election, however, the New Alliance Party was able to gather the requisite number of signatures to place its presidential and vice presidential candidates on the general election ballot in West Virginia in accordance with the revised scheme devised by the legislature in 1986 following *Anderson*. The court concludes that these revised deadlines for the two highest national offices are constitutionally sound.

**15.** Section 3–5–8a states:

A candidate seeking nomination to any office who is unable to pay the filing fee may qualify through the following petition process in lieu of payment of the filing fee.

The candidate shall file an oath with the appropriate office required under section eight [§ 3–5–8] of this article stating that he is unable to pay the filing fee due to a lack of financial resources. Such oath shall be filed not earlier than the second Monday in January next preceding the primary election day.

Upon receipt of the written oath the receiving officer shall provide the candidate with in-lieu-of-filing-fee petition forms and instructions on gathering the required signatures.

. . . .

Signatures obtained on an in-lieu-of-filing-fee petition shall not be counted toward the number of voters required to sign a nomination certificate in accordance with section twenty-three [§ 3–5–23] of this article.

The candidate shall file all in-lieu-of-filing-fee petitions with the required number of valid signatures with the county clerk or secretary of state, as the case may be, not later than the last date required by law for filing declarations of candidacies and payment of the filing fee.

ing significant voter support solely by the neutral fact of payment of a filing fee. States may, for example, impose on minor political parties the precondition of demonstrating the existence of some reasonable quantum of voter support by requiring such parties to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election. See *American Party of Texas v. White, post,* [415 U.S.] p. 767 [94 S.Ct. 1296, 39 L.Ed.2d 744] Similarly, a candidate who establishes that he cannot pay the filing fee required for a place on the primary ballot may be required to demonstrate the "seriousness" of his candidacy by persuading a substantial number of voters to sign a petition in his behalf.

*Id.* at 718–19, 94 S.Ct. at 1320–21 (footnote omitted).

Relying on *Lubin,* the West Virginia Supreme Court of Appeals in *Manchin* invalidated, as to impecunious candidates, the filing fee provision contained in § 3–5–8 for failure to provide a reasonable alternative for such candidates to obtain ballot access. *Manchin,* 270 S.E.2d at 639. While awaiting legislative action, then Secretary of State Manchin adopted temporary measures to allow potential candidates to avoid payment of a filing fee by filing a financial hardship statement. The West Virginia Supreme Court of Appeals in *Garcelon v. Rutledge,* 318 S.E.2d 622 (W.Va.1984), nullified the temporary measures as unconstitutionally vague. *Id.* at 625–26. The court opined:

> Both the United States Supreme Court in *Lubin v. Panish,* 415 U.S. 709, 718–19, 94 S.Ct. 1315, 1321, 39 L.Ed.2d 702, 710 (1974), and this Court in *West Virginia Libertarian Party,* 270 S.E.2d at 639, recognized that nominating petitions provide an attractive alternative to filing fees that advance and protect many of the interests that filing fees are ostensibly designed to advance and protect.

*Id.* at 626.

In response to the court's suggestion, the West Virginia Legislature enacted § 3–5–8a, establishing an alternative for candidates who could not afford to pay the filing fee of 1% of the salary of the office sought. Under § 3–5–8a, the candidates may instead submit in-lieu-of-filing-fee petitions representing four petitions or signatures for each whole dollar of fee. Under the alternative, plaintiff McBride in the current year was required to file 3,580 petitions, plaintiff Gotesky 3,580 petitions, and plaintiff Brady 1,728 petitions.

The issue turns on the reasonableness of the alternative method selected by the legislature. The alternative is rather simple in that the number of signatures required is modest [16] and may be obtained from a pool of all of the registered voters qualified to vote for a given office whether or not those voters cast a ballot in the primary. As applied to third party and independent candidates, the alternative scheme is further eased by permitting the signatures to be collected over a period of some three months extending from the second Monday in January down to a date thirty-one days prior to the primary. On the other hand, major party candidates are given less than a month in which to collect their signatures, beginning the second Monday in January.

Moreover, the defendants concede that third party and independent candidates may, by simultaneously circulating two separate petitions and asking the same voters to sign both a fee and a nominating petition, avoid the prohibition contained in § 3–5–8a against using signatures obtained on a fee petition to be counted towards a nominating petition. As applied to the plaintiffs, the court finds the method selected by the legislature for candidates unable to pay a filing fee to obtain ballot access to be reasonable.

## IV.

Accordingly, it is ORDERED that the motion for summary judgment filed by plaintiffs Socialist Workers Party, George Richard McBride, James Kenneth Gotesky, Elvena Elizabeth Brady, Cleve Andrew Pul-

---

**16.** *See Cross v. Fong Eu,* 430 F.Supp. 1036, 1041 (N.D.Cal.1978) (court found requirement of gathering 10,000 signatures in lieu of filing a fee to be reasonable).

ley and Toba Leah Singer be, and the same hereby is, denied.

It is further ORDERED that the motion for partial summary judgment filed by defendants Ken Hechler, Allan Hammock, Barbara Ruley, Ben Bryant and Perry Reed be, and the same hereby is, granted.