Karl **HESS,** Christine **Fishbeck,** Brian **Horton,** the **Libertarian National Committee,** and the **West Virginia Libertarian Party,** Plaintiffs,

v.

Ken **HECHLER,** Secretary of State, Defendant.

Civil Action No. 2:92–0807.

United States District Court, S.D. West Virginia, Charleston Division.

March 31, 1995.

Robert M. Batress, Jr., Morgantown, WV, for plaintiffs.

Darrell V. McGraw, Jr., Office of Attorney General, Charleston, WV, A. Renee, Special Assistant Attorney General, Deputy Secretary of State, Office of Secretary of State, Charleston, WV, Barry L. Koerber, Assistant Atty. Gen., Office of Attorney General, Charleston, WV, for defendant.

### *MEMORANDUM ORDER*

COPENHAVER, District Judge.

This matter is before the court on plaintiffs' complaint for a permanent injunction prohibiting the defendant from enforcing West Virginia's statutory imposition of a primary eve deadline for the filing of signatures in support of minor party and independent candidate nominating petitions for public offices other than president and vice president, W.Va.Code § 3–5–24. In their complaint, plaintiffs seek to compel the defendant to accept such signatures through at least August 1st of each election year. However, in their reply brief on the motions for summary judgment, they state that they do not contend that an August deadline is constitutionally required but only that the "current pre-primary May deadline in May violates the First and Fourteenth Amendments." (Pls.' Reply Mem. at 12, n. 4.) It thus appears that plaintiffs have modified the relief sought to the extent that it would compel an extension of the filing date to August 1st.

The complaint also seeks a declaration that the primary eve filing deadline violates rights guaranteed to plaintiffs under the First and Fourteenth Amendments to the United States Constitution. The parties have agreed that the case be submitted for final resolution based on their stipulations of facts, cross motions for summary judgment, memoranda of law, depositions, affidavits and other supporting documents.[1]

---

1. By order entered on September 8, 1992, and supplemented by a memorandum order entered on September 11, 1992, in which the court detailed the reasons for its decision, plaintiffs' motion for preliminary injunctive relief was denied on the ground of laches. Finding that the issues presented in plaintiffs' complaint were capable of repetition yet evading review in future elections, the court directed the parties to proceed on the merits with respect to the request for a perma-

## I. *Background*

At issue in this action is West Virginia's statutory scheme governing the procedure by which independent candidates and candidates who are members of political parties which polled less than ten percent of the total vote cast for governor in the last general election (hereinafter, minor party candidates) may use nominating certificates to gain access to the state's general election ballot for offices other than president and vice president.[2] Independent and minor party candidates are entitled to use the nominating certificate process to have their names placed on the state's official election ballot only if they comply with the requirements of Chapter 3, Article 5, sections 23 and 24, of the West Virginia Code. *See* §§ 3–5–22 (minor party candidates) & 3–5–23 (independent candidates).

The process involves the gathering of signatures of duly registered voters on nominating certificates, sometimes commonly called petitions. Candidates, except those for county and magisterial district offices, file their certificates with the Secretary of State. § 3–5–24. The number of signatures must equal one percent of the entire vote cast in the last general election for the particular office being sought. § 3–5–23(c). Persons signing nominating petitions may not vote in the primary election to be held that year and those soliciting signatures must advise voters orally and in writing in language prescribed by the Secretary of State, that if they sign the petition, they may not vote at the upcoming primary election. § 3–5–23(c)–(d). The nominating certificates must be filed with the Secretary of State "not later than the day

preceding the date on which the primary election is held." § 3–5–24. After that date, no nominating certificate "shall be received." *Id.* Primary elections are currently held on the second Tuesday in May. § 3–5–1. For the national offices of president and vice president, the deadline for filing nominating petitions is the "first day of August preceding the general election."[3] § 3–5–23(a).

Plaintiff Karl Hess was the Libertarian Party candidate for governor in West Virginia in 1992 and plaintiff Brian Horton was its candidate for state auditor.[4] Because the Libertarian Party did not poll the requisite number of votes for governor in 1988, its candidates were required to follow the petitioning process to obtain access to the general election ballot in 1992. The number of signatures required for Hess was approximately 6,500. (Stip. ¶ 22.) The Libertarian Party, under the direction of Horton, who was coordinating his first petition drive, began its efforts to obtain the required number of signatures on approximately March 1, 1992. As required by section 3–5–24, the nominating petitions supporting Hess' candidacy were filed on May 11, 1992, the day before the primary election. (Stip. ¶ 21.) The petitions contained 11,159 signatures. (Stip. ¶ 22.)

In checking the signatures on the petitions submitted, the Secretary of State concluded that 6,704 were invalid, reducing the number that could be counted to 4,355, less than the approximately 6,500 necessary for Hess to gain access to the ballot. (Stip. ¶ 24.) Of the signatures invalidated, 4,130 were found by county clerks to be of persons not legally

---

nent injunction and declaratory relief. (Mem. Order of 9/11/92 at 16–17 & n. 7.)

**2.** Political parties which polled at least ten percent of the total vote cast for governor in the last general election and candidates for the national offices of president and vice president are not subject to the procedure at issue in this action.

**3.** The statute currently in effect, which permits presidential and vice presidential candidates to file by August 1st, but continues to require all other candidates to comply with the primary eve filing deadline, was enacted in 1986. The change to a later date for the offices of president and vice president was made in response to the decision by the United States Supreme Court in

*Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), which held that Ohio's March 20th filing deadline was unconstitutional at least with respect to independent presidential and vice presidential candidates. *See Socialist Workers Party v. Hechler,* 696 F.Supp. 190, 196 (S.D.W.Va.1988), *aff'd in part, rev'd in part,* 890 F.2d 1303 (4th Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990).

**4.** Plaintiffs also include the Libertarian National Committee and the West Virginia Libertarian Party, the national and state Libertarian Party organizations, and Christine Fishbeck, a member of the Libertarian Party who hopes to support its candidates for state office in the future.

registered to vote. The remaining 2,574 were not credited as part of an agreement reached between the Libertarian Party and the Secretary of State which provided that the signatures of persons who voted in the primary election would not be counted.[5] (Stip. ¶ 24(a).) In late July 1992, the Secretary of State notified the Libertarian Party that Hess had failed to submit the requisite number of signatures to qualify for a position on the November ballot. (Stip. ¶ 24.)

After learning that they lacked a sufficient number of signatures on the certificates filed on May 11, 1992, the Libertarian Party resumed its efforts to obtain the necessary signatures to qualify its presidential and vice presidential candidates by the August 3, 1992, deadline.[6] (Stip. ¶¶ 25–26.) Horton "effectively resigned from the campaign" on May 13, 1993, and was replaced by two national directors. (Stip. ¶¶ 23, 26.) Between July 22, 1992, and August 3, 1992, they coordinated a drive which solicited 4,821 additional signatures in support of Hess and the Libertarian Party's nominees for president and vice president. (Stip. ¶¶ 26–28.) The additional nominating petitions were filed on August 3, 1992, and 2,202 of them were subsequently verified as valid. (Stip. ¶ 28.) The Secretary of State accordingly informed the Libertarian Party that it had qualified its nominees for president and vice president and that their names would appear on the general election ballot. (Stip. ¶ 29.)

Of the signatures submitted by the Libertarian Party before the primary election, 39.92% were valid. (Stip. ¶ 48). As to those additional signatures filed after May 11, 1992, the validity rate was 45 to 46%, for an overall validity rate of 41.5%. By comparison, independent and minor party candidates for the House of Delegates had validity rates of 86.06% (independent), 85.46% (indepen-

dent) and 32.32% (Socialist Workers) and a minor party candidate for a county office in Monongalia County had 71.61% of her signatures validated. (Stip. ¶ 48.) Ross Perot, an independent candidate for president, who accordingly did not have to submit his petition until August, had a validity rate of 80.95%. (Stip. ¶ 48.)

Pursuant to section 3–5–24, the Secretary of State was prohibited from crediting Hess with the additional signatures filed on August 3, 1992. Had the prohibition against receiving petitions after May 11, 1992, not been applicable to Hess and the Secretary of State had been allowed to give him credit for the petitions filed on August 3, 1992, when those for the president and vice president nominees were due, Hess would have qualified for a position on the general election ballot because the signatures submitted on his behalf on May 11, 1992, combined with the additional signatures filed on August 3, 1992, exceeded the 6,500 required. (Stip. ¶¶ 30–31.)

As a result of Hess' failure to qualify for a position on the 1992 general election ballot, the Libertarian Party had no candidate for governor that year. Consequently, it did not poll at least ten percent of the total votes cast for all candidates for governor in the 1992 election and the Party's 1996 candidates will again be required to comply with the procedures set forth in sections 3–5–23 and 3–5–24 in order to appear on the general election ballot in 1996. (Stip. ¶ 32.)

■ In their motion for summary judgment, plaintiffs contend that the primary eve filing deadline of section 3–5–24 violates rights protected by the First and Fourteenth Amendments of the United States Constitution[7] by unnecessarily imposing severe ballot access restrictions, as demonstrated by the few number of independent and minor party

---

5. The agreement resolved a dispute over whether some of the persons soliciting signatures had failed to notify those signing the certificates that they could not both sign a certificate and vote in the primary election.

6. The deadline for the filing for president and vice president is, by statute, "the first day of August preceding the general election." § 3–5–23. August 1, 1992, was a Saturday, making the deadline that year August 3rd.

7. The First Amendment guarantees voting and political association rights, which are protected against infringement by the states under the Fourteenth Amendment. *See Hagelin for Pres. Comm. of Kansas v. Graves,* 25 F.3d 956 (10th Cir.1994); *New Alliance Party of Alabama v. Hand,* 933 F.2d 1568, 1572 (11th Cir.1991) (discussing *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)).

candidates who have succeeded in securing positions on the general election ballot during the years that a spring filing deadline has been in effect. Defendant Secretary of State opposes plaintiffs' motion, as an initial matter, on the ground of prior precedent set in this court's opinion in *Socialist Workers Party v. Hechler,* 696 F.Supp. 190 (S.D.W.Va. 1988), *aff'd in part, rev'd in part,* 890 F.2d 1303 (4th Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990). The Secretary also maintains that the primary eve filing deadline is constitutionally valid inasmuch as it is a reasonable nondiscriminatory restriction justified by the state's legitimate interest in providing a fair election process for all candidates and the voting public.

## II. *Discussion*

### A. *The Socialist Workers Party Litigation*

▮▮▮ The constitutional validity of the May primary eve filing deadline imposed by section 3–5–24, coupled with the prohibition against voting in the primary election after signing a nominating petition, (hereinafter, sometimes referred to as the forced choice provision), was previously challenged and upheld by this court in *Socialist Workers v. Hechler,* 696 F.Supp. 190 (S.D.W.Va.1988), *aff'd in part, rev'd in part on point unrelated to the issue in this case,* 890 F.2d 1303 (4th Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990).[8] In reaching its conclusion, the court applied the analysis set forth in *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983), where Ohio's March filing deadline for independent presidential candidates was struck down. Under *Anderson's* three-step analysis, "the character and magnitude of the challengers' asserted interests are assessed, the interests put forward by the state to justify the burdens imposed are identified and evaluated, and the state's interest in a valid election system is measured against the necessity of burdening the challengers' right to run." *Socialist Workers,* 696 F.Supp. at 198 (citing *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570). The *Anderson* balancing test recognizes that there must be a substantial regulation of elections if they are to be fair and honest and conducted in an orderly manner. *Id.* at 193 (citing *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70). It also recognizes that states have "the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." *Id.* (quoting *Anderson,* 460 U.S. at 788–89 n. 9, 103 S.Ct. at 1570 n. 9). Consequently, the "State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.* (quoting *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70).

The court in *Socialist Workers* noted additionally that in determining the overall burden placed on candidates seeking access to the ballot by the petition method, it was appropriate to consider "the pool of available signers, the amount of time in which the signatures can be obtained, and the date of the filing deadline." *Id.* (citing *Developments—Election Laws,* 88 Harv.L.Rev. 1111, 1125 (1975)). Examining those factors, the court found that notwithstanding the statutorily imposed forced choice provision, in the eleven presidential primary elections held in West Virginia between 1948 and 1988, independent and minor party candidates had, on average, a pool of available signers that nearly equalled one-half of all registered voters in the state. *Id.* at 199. The court also found that the primary eve filing deadline was later, and thus, less restrictive, than that upheld by courts in other jurisdictions and that the impact of the early filing date was ameliorated by West Virginia's lack of restraint

---

8. In the earlier case of *West Virginia Libertarian Party v. Manchin,* 165 W.Va. 206, 270 S.E.2d 634, *appeal dismissed sub nom. Citizens Party v. Manchin,* 449 U.S. 802, 101 S.Ct. 46, 66 L.Ed.2d 5 (1980), the West Virginia Supreme Court of Appeals upheld the validity of a primary eve filing deadline for independent and third party candidates for all offices. *Id.* at 643–46. Insofar as the decision applied to candidates for president and vice president, it was overruled by the United States Supreme Court's holding in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

on the period of time in which to gather signatures. *Id.* In addition, it was observed that neither the required percentage of signatures (one percent of the votes cast in the last election for that office), nor the raw number of signatures required (no more than 7,222 for any office in the 1988 election), was particularly burdensome when compared to requirements found to be reasonable in other states. *Id.* at 199–200. Nonetheless, the court concluded that the primary eve deadline, "when coupled with the forced choice of voters," burdened plaintiffs' associational rights to "some significant extent." *Id.* at 200. Consequently, the state was required to justify the burden imposed. *Id.*

Looking to the state's asserted interest, the court observed that the primary eve filing deadline promotes the state's legitimate interest in ensuring that voters be able to make an informed primary election choice as between all candidates and their positions, *id.,* and that it likewise serves the important state interest of requiring independent and minor party candidates to "make a preliminary showing of significant support before being placed as a candidate on the state's general election ballot," *id.* at 201 (citing *Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)).

Balancing the burdens on those seeking ballot access by the petition method against the state's asserted interests, the court employed a scale of "reasonableness," requiring it to determine whether the restrictions being challenged "freeze the status quo by effectively barring all candidates other than those of the major parties," or whether "a reasonably diligent candidate" could be expected to satisfy the filing requirements. *Id.* (quoting *McLain v. Meier,* 851 F.2d 1045, 1050 (8th Cir.1988) (quoting *Libertarian Party of Florida v. State of Florida,* 710 F.2d 790, 793 (11th Cir.1983), *cert. denied,* 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984)); *Storer v. Brown,* 415 U.S. 724, 742, 94 S.Ct. 1274, 1285, 39 L.Ed.2d 714 (1974)). In answering those inquiries, the court found that the Socialist Workers, having made "no effort to collect signatures," failed to comply with the " 'reasonably diligent candidate' standard of *Storer.*" *Id.* at 202. Nor was

there any showing that the state's laws governing ballot access operated to "freeze the status quo" and limit access to major parties. On balance, the court concluded that inasmuch as the burdens imposed were "not great," the restrictions on ballot access were not unreasonable when compared to the state's strong interest in requiring independent and minor party candidates to "demonstrate a modicum of community support" before their names are placed on the general election ballot. *Id.* at 201–02.

On appeal, the Fourth Circuit Court of Appeals, applying the *Anderson* balancing test, affirmed with respect to the reasonableness of the forced choice provision. *Socialist Workers Party v. Hechler,* 890 F.2d 1303, 1305–07 (4th Cir.1989). In doing so, the Fourth Circuit rejected the Socialist Workers' argument that many voters would be unwilling "to abandon their right to vote in the primary until the last minute, if at all," and the additional argument that many voters would be reluctant to sign the petition knowing that it would result in their being unable to vote in other primary races as well. *Id.* at 1305. Reviewing pertinent case law and guided by the Supreme Court's statement in *Anderson* that the state's "interest in regulating the number of candidates on the ballot in order to avoid voter confusion, whether it be described as 'important' or 'compelling' is 'generally sufficient to justify reasonable nondiscriminatory restrictions,' " *id.* at 1306 (citing *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70) (internal citations omitted), the Fourth Circuit concluded that "on balance, West Virginia's scheme is no more burdensome, and in some important respects is less burdensome, than those of other states which have been found constitutional." *Id.* at 1307. In particular, the court noted that the restriction imposed by the forced choice provision was balanced by the small number of signatures required and the absence of any time limitation for gathering the signatures. *Id.* at 1306.

The parties disagree about the effect of the *Socialist Workers* litigation on the ballot access challenge raised in this action. Plaintiffs contend that unlike the challengers in *Socialist Workers,* they have compiled data

for the court's assessment showing an historical pattern of exclusion from the ballot of independent and minor party candidates for state and local offices during the periods that spring primary eve filing deadlines have been in effect in West Virginia. According to the plaintiffs, the historical pattern of exclusion demonstrates a far more onerous burden than that presented by the Socialist Workers and thus, in plaintiffs' view, a different standard of review applies.

Rather than reviewing the restrictions under the "reasonableness" standard employed in *Socialist Workers* on the assumption that the restrictions had no significant adverse impact on ballot access, plaintiffs maintain that their showing is one of severe restriction and warrants examination under the formula set forth in the subsequently decided cases of *Norman v. Reed,* 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992) and *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). In those cases, the United States Supreme Court stated that when ballot access laws subject First and Fourteenth Amendment rights to " 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " *Norman,* 502 U.S. at 289, 112 S.Ct. at 705 (citing *Illinois Elections Bd. v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979)); *see also Burdick,* 504 U.S. at 432–34, 112 S.Ct. at 2063 (citing *Norman,* 502 U.S. at 288–89, 112 S.Ct. at 705 and applying same standard to voting rights case). Plaintiffs claim as an additional factual distinction, that they, unlike the plaintiffs in *Socialist Workers,* had a "reasonably diligent candidate" who would have qualified for a position on the general election ballot but for the primary eve filing deadline and the statutory prohibition against accepting petitions presented after that date.

For his part, the Secretary of State concedes that plaintiffs can demonstrate that few independent and minor party candidates have gained access to the ballot since 1937. He asserts, however, that plaintiffs cannot show that there is a causal relationship between the primary eve filing deadline and the demonstrated lack of success and that factors other than the primary eve deadline explain why so few candidates have obtained ballot access through the petitioning process. The Secretary also disputes plaintiffs' claim that the Libertarian Party was "reasonably diligent" in its pre-primary efforts to obtain the number of signatures required for Hess. He thus maintains that reexamination of the validity of section 3–5–24 under a standard more rigorous than that employed in *Socialist Workers* is not warranted and the court's decision in that case should control this litigation.

Plaintiffs note correctly that in considering the first prong of the *Anderson* inquiry— "the character and magnitude of the asserted injury"—this court concluded in *Socialist Workers* that "[i]t appears that the burdens placed upon the challengers under West Virginia laws are not great." *Socialist Workers,* 696 F.Supp. at 201. It was also noted that the Socialist Workers "made no effort to collect signatures," thus failing the "reasonably diligent candidate" standard. The court further found, on the facts before it, that West Virginia's election laws did not operate to "freeze the status quo." *Id.* at 202.

Plaintiffs now before the court seek to present a different set of facts and they should be permitted to do so. However, as will be seen, the newly offered information does not demonstrate a "severe" restriction. Thus, the "reasonable, nondiscriminatory" standard enunciated in *Anderson* and applied in *Socialist Workers,* 890 F.2d at 1304–06, is applicable here as well.

B. *Character and Magnitude of Plaintiffs' Asserted Injury*

Reference to historical data as a means of determining the character and magnitude of the asserted injury was approved by the United States Supreme Court in *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), which stated the appropriate inquiry as being:

> [C]ould a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot? Past experience will be a helpful, if not always an unerring,

guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.

*Id.* at 742, 94 S.Ct. at 1285; *see also Mandel v. Bradley*, 432 U.S. 173, 178, 97 S.Ct. 2238, 2241, 53 L.Ed.2d 199 (1977) (citing *Storer*) (courts must analyze what the past experience of independent candidates for statewide office might indicate about the burden imposed on those seeking access to the ballot); *Bergland v. Harris*, 767 F.2d 1551, 1555 (11th Cir.1985) (citing *Mandel*, 432 U.S. at 178, 97 S.Ct. at 2241) (analyzing the past experience of independent and minor party candidates as an indicator of the burden imposed).

Ascertaining the extent to which West Virginia's ballot access laws operate to freeze the status quo by precluding reasonably diligent independent and minor party candidates from obtaining a position on the ballot is complicated by the unavailability of information about the number of independent and minor party candidates who sought access to the ballot and why they were unsuccessful.[9] Consequently, except for the 1992 election, the parties are able to present data showing only the number of candidates who were successful as evidenced by the inclusion of their names on the general election ballots. The data is presented on defendant's Table 1.[10]

It is conceded by the plaintiffs that prior to 1937, minor party candidates were relatively successful in gaining access to the ballot. For that period, it is noted that the data supplied for the years prior to the 1924 election is somewhat sketchy. In addition, the ballot access laws in effect for the 1924 election remained unchanged until 1932, when

significant amendments were enacted. Given the incomplete data for elections prior to 1924, the court finds it appropriate to start its examination with a summary of the election laws contained in the Code of 1923. For ease of analysis, the data presented is summarized in time periods which coincide with potentially significant amendments to the ballot access statutes to better correlate changes in the election laws with success in obtaining ballot access.

Within the period from 1923 to 1932, the state conducted, alternatively, May and August primaries. Barnes W.Va.Code Ann. 1923, Ch. 3, § 26a(2). In presidential election years, the primary was held on the last Tuesday in May. In all other years, it was held on the first Tuesday in August. Independent and minor party candidates could gain access to the general election ballot through the petitioning process. *Id.* at §§ 26a(3) & 26a(23). The number of signatures required was "one percent of the entire vote cast in the last preceding general election in the state ... or other division for which the nomination is made," with a cap of one thousand signatures. *Id.* at § 26a(23). It was a felony for a person signing a petition to thereafter vote in the primary. *Id.* The filing date for nominating petitions was either twenty days after the primary or thirty days before the primary.[11] *Id.* at §§ 26a(3) & 26a(23).

In the four elections held between 1923 and 1931, there were fifteen minor party candidates for state legislature, seventeen for statewide offices, and seven for United States Congress, a total of thirty-nine candidates. Of those thirty-nine, thirty-four gained access to the ballot in presidential

---

**9.** Plaintiffs sought to obtain that information during discovery but to the extent that those records existed for candidates seeking statewide offices prior to 1985, they were effectively destroyed as a result of faulty storage conditions. Records as to local offices, which are obtainable only from the offices of the county clerks of West Virginia's fifty-five counties, were not sought except for the 1992 election.

**10.** Table 1 is attached to defendant's memorandum opposing plaintiffs' motion for summary judgment and supporting his cross motion for summary judgment.

**11.** The Code of 1923 contains a conflict with respect to the filing date. *Compare* § 26a(3) (nominating certificates for independent and minor party candidates to be filed 20 days after primary election) *with* § 26a(23) (nominating certificates for minor party candidates to be filed 30 days before the primary). *See* Legislative Note, W.Va.Code of 1932, § 3–4–30; Ch. 3, § 93[30], recognizing the conflict and suggesting that on the basis of *State v. Wells*, 87 W.Va. 275, 104 S.E. 591 (1920), the operative filing date was 20 days after the primary.

election years when the primary was conducted in May, while only five were on the ballot in the off-years having an August primary. In addition, in each of the two presidential elections, there were three minor party candidates for president.

The Code of 1932 reflects several changes to the process of obtaining nomination through the certification process. The primary date in presidential election years was moved from the last to the second Tuesday in May. W.Va.Code of 1932, § 3–3–1; Ch. 3, § 64[1]. In non-presidential years, the primary date remained the first Tuesday in August. *Id.* The cap of one thousand signatures was eliminated, *id.* at § 3–4–29, Ch. 3, § 92[29], as being "unnecessary," *id.* at Revisers' Note. The forced choice provision remained, *id.* at § 3–4–29, Ch. 3, § 92[29], but the penalty was reduced from a felony to a misdemeanor, *id.* at § 3–7–24, Ch. 3, § 173. The certificate filing deadline was changed to the day preceding the primary.[12] *Id.* at § 3–4–30, Ch. 3, § 93[30].

Three elections were held between 1932 and 1937, when further changes were made to the certification procedure. In those elections, there were thirty-five candidates for state legislature, twenty-four for statewide offices, eighteen for United States Congress, and five for president. The total number of candidates gaining access to the ballot for state offices in those three elections was seventy-seven. Two of the elections were in presidential election years having a May primary. In those two elections, fifty-six candidates were on the ballot for state offices. The large number of candidates gaining access to the ballot indicates that removing the cap of one thousand signatures had no adverse effect.

The legislature made changes in the certification process again in 1937. The primary dates remained the same; namely, the second Tuesday in May in presidential election years and the first Tuesday in August in off-year elections. The primary eve filing deadline was retained, no changes were made with respect to the percentage of signatures needed, no cap was reinstated on the number required, and the misdemeanor penalty for violation of the forced choice provision was unchanged. However, candidates seeking nomination by certification were, for the first time, required to file a declaration of candidacy containing "the name of the political party" they proposed to represent[13] thirty days prior to filing their nominating certificates and, at the same time, pay a filing fee. W.Va.Code of 1937, § 3–4–29; Ch. 3, § 92[29] (1941 Cum.Supp.). Persons soliciting signatures had to first obtain authorization to do so. *Id.* Canvassers were required to be residents and registered voters of the magisterial district in which they would canvass and they could solicit signatures only from registered resident voters within that district. *Id.*

After the 1937 modifications, no pertinent changes were made in the requirements for nomination by the certification method until 1963. Thirteen elections were held during that period. No independent or minor party candidate appeared on the general election ballot for any state office in any of those thirteen elections. Only one presidential candidate was on the ballot, that being Henry Wallace, the Progressive Party's nominee in 1948.

Beginning with the 1964 election and continuing through the election in 1978, the only pertinent change made in the certification process was the elimination of the August off-year primary, with the result that the primary date for all elections was the second Tuesday in May. W.Va.Code § 3–5–1 (1963). In the eight elections held during those years, no independent or minor party candidate appeared on the general election ballot for any state office and only one presidential candidate appeared, that being George Wal-

---

**12.** The Revisers' Note to § 3–4–30, Ch. 3, § 93[30], states that the change in filing date is made to enable "the voter to make his decision in the light of conditions at the time of the primary," it seeming "unfair to require a decision so long ahead of the primary." The Legislative Note provides the further explanation that the change eliminates the conflict on filing dates contained in the Code of 1923. See, *supra,* page 1147–1148 & note 11.

**13.** Prior to 1937, there was nothing in the statute governing petitions by independent candidates requiring "the name of the political party."

lace, who was on the 1968 ballot as the nominee for the American Party.

In 1978, the primary date was moved from the second Tuesday in May to the first Tuesday in June for primary elections commencing in 1980. W.Va.Code § 3–5–1 (1979 Repl. Vol.) All other provisions in the certification process remained the same and no legislative changes occurred until 1985. However, in the interim, the West Virginia Supreme Court of Appeals decided *West Virginia Libertarian Party v. Manchin*, 165 W.Va. 206, 270 S.E.2d 634 (1980). In its decision, the West Virginia Supreme Court held that the failure to provide a reasonable alternative to the filing fee was unconstitutional insofar as it applied to impecunious candidates. *Id.* 270 S.E.2d at 638–39. The magisterial district restriction was struck down as not being justified by a compelling state interest. *Id.* 270 S.E.2d at 640–42. In addition, it was held that independent candidates must be given the same right to ballot access as that of minor party candidates and thus the requirement that an independent candidate, in the declaration of candidacy, "name the political party" the candidate proposed to represent was declared unconstitutional. *Id.* 270 S.E.2d at 639–40. On the other hand, the West Virginia Supreme Court upheld the constitutionality of the credentials requirement for canvassers, *id.* 270 S.E.2d at 642–43; the primary eve filing deadline, *id.* 270 S.E.2d at 643–46; and the prohibition against both signing a petition and voting in the primary, *id.* 270 S.E.2d at 646–48. As a result of the lawsuit, John Anderson appeared on the 1980 general election ballot as an independent candidate for president. The Libertarian Party also had a candidate for president. In addition, there was a Libertarian Party candidate for statewide office on the 1980 general election ballot. Although the *Manchin* decision is dated September 16, 1980, the West Virginia Supreme Court announced its ruling on May 22, 1980, in order to allow prospective candidates to meet the June 2 filing deadline. *Manchin*, 270 S.E.2d at 637.

Candidates seeking access to the ballot in the next election, that of 1982, operated under the same petitioning laws that governed the 1980 election, with the exception of those provisions struck down by the West Virginia Supreme Court in *Manchin*. Consequently, no filing fee was required, no designation of party name was needed, and canvassers were no longer restricted to the same magisterial district in which the voters being solicited reside. *Id.* 270 S.E.2d at 648. However, the forced choice provision, the June primary date, the primary eve filing deadline, and the certification requirement for petitioners remained unchanged. *Id.* In that year, four minor party candidates for state office succeeded in having their names placed on the ballot, two for the state legislature, one for the United States House of Representatives and one for the United States Senate.

The 1984 election differed from the 1982 election only in that the May primary eve filing deadline was suspended in the wake of the decision of the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). All candidates had, instead, until August to file their nominating certificates. (Stip. ¶ 35.) Three minor party candidates for president gained access to the ballot in the 1984 election. One minor party candidate appeared on the ballot for United States Senate.[14] (Stip. at ¶ 36). However, notwithstanding the August filing date and the lessening of the restrictions mandated by the West Virginia Supreme Court's decision in *Manchin*, there were no independent or minor party candidates for the state legislature or for statewide offices.

In 1985, the legislature changed the primary date from the first Tuesday in June to the second Tuesday in May, where it remains today. W.Va.Code § 3–5–1 (1985). Amendments in 1986 conformed the statutory provisions to reflect the changes mandated by the West Virginia Supreme Court of Appeals in 1980 in the *Manchin* litigation and by the United States Supreme Court's 1983 decision in *Anderson*. The deadline for filing nomi-

---

**14.** The presence of a minor party candidate for United States Congress in 1984 was inadvertently omitted from defendant's Table 1. It is agreed that a Socialist Workers Party candidate gained access to the ballot in 1984.

nating petitions was accordingly changed to August 1 for presidential and vice presidential nominees, but the primary eve deadline remains in effect for all other candidates. W.Va.Code § 3–5–23 (1986). Declarations of candidacy must be filed and filing fees paid thirty days prior to the certificate filing deadline. *Id.* However, the declaration need not contain the name of a political party, *id.*, and a candidate unable to pay the filing fee may, in the alternative, file an "in-lieu-of-filing-fee petition" signed by voters who do not, by signing the petition, forfeit their right to vote in the primary, *id.* at § 3–5–8a. Solicitors must still obtain authorization to solicit signatures, but they need only be registered to vote in the state and may solicit signatures from throughout the "county, district, or other political division represented by the office sought." *Id.* at § 3–5–23(b). The number of signatures needed remains at one percent of the vote cast for that office in the last preceding general election, with no cap on the number required. *Id.* at § 3–5–23(c). The forced choice provision continues to be in effect. *Id.* at § 3–5–23(f); § 3–9–18.

In the period between the last legislative changes in 1986 to date, there have been four elections. Three independent or minor party candidates for president have gained access to the ballot, one in 1988 and two in 1992. In 1986 and 1988, no independent or minor party candidate appeared on the general election ballot as a nominee for either the state legislature, a statewide office or United States Congress. In 1990 and again in 1992, there was one independent candidate for the state legislature. A second independent candidate for the state legislature qualified in 1992 but withdrew before his name was placed on the ballot. (Stip. at ¶ 41.) A third independent candidate paid the filing fee for state senate, but did not appear on the ballot. (*Id.*) Whether his failure to appear on the ballot

was a result of his inability to collect the required number of signatures is not known. Two Socialist Workers Party candidates sought but failed to achieve a sufficient number of signatures to obtain a position on the 1992 ballot for the state legislature. (Stip. at ¶ 44.) Three independent candidates seeking the office of sheriff were certified to the county election ballots in 1992. (Stip. at ¶ 43.) One Populist candidate for county commission was certified. (Stip. at ¶ 42.)

Based on the above data, plaintiffs contend that it is apparent that West Virginia's ballot access laws have a debilitating effect on the ability of independent and minor party candidates to gain ballot access. The most onerous requirement, they contend, is the spring filing deadline. In support, they note that only four candidates for president and vice president and eight candidates for state offices [15] have been successful in gaining access to the ballot in the elections since 1937 in which a spring filing deadline was in effect. Only one of the eight candidates gaining access to the ballot for a state office was running for a statewide office. Four ran for the state legislature, one ran for the United States Senate and one ran for the United States House of Representatives. On the other hand, plaintiffs maintain, during those periods since 1980 when the spring filing date has not been in effect, as in 1984 when it was suspended, and since then with respect to the offices of president and vice president, minor party candidates have met with success. In particular, in 1984, one minor party candidate obtained access to the ballot for the office of United States Senate, and six minor party candidates for president and vice president have appeared on the ballot when given until August to file their nominating petitions. Those who must continue to file their petitions the day before a May primary, plaintiffs assert, show no corresponding increase in the rate of success.[16] The forced

---

**15.** Defendant's Table 1 shows only seven candidates for state office from the period 1937 to date when a spring filing deadline was in effect. However, Table 1 does not list an independent candidate who qualified for the state legislature in 1992 but withdrew before his name was placed on the ballot.

**16.** As added support for their contention that West Virginia's ballot access laws have a drastic effect on independent and minor party candidates, plaintiffs allege that in 1992, only two other states also failed to place an independent or minor party candidate on the ballot for United States Congress, (Supp.Stip. ¶ 1), and in one of those states, Nebraska, there was no race for

choice provision, according to plaintiffs, adds to the burden of the early filing deadline because voters are reluctant to relinquish their right to vote in the primary. This is particularly so, they contend, in West Virginia, which is dominated by one political party, with the result that the primary election frequently decides the race.

The Secretary of State concedes that independent and minor party candidates have had little success in gaining access to the general election ballot in the years since 1937. He maintains, however, that there is no cause and effect relationship between the primary eve filing deadline and the lack of success. He notes initially that both the primary eve filing deadline and the forced choice provision were in effect for many of the years between 1923 and 1937 when independent and minor party candidates enjoyed relative success in gaining access to the ballot. The noticeable decrease in the years following 1937, the Secretary thus maintains, is attributable to other factors. An alternative explanation, he suggests, is the historical support of West Virginia's voters for the Democratic Party, with a corresponding lack of interest in independent and minor party candidates, as evidenced by the small percentage of voters who are not registered as Democrats or Republicans and by the frequency with which even major party voters, notably Republicans, are unable to secure candidates for state offices. The Secretary notes, in addition, that historians have observed a nationwide decrease in voter interest in minor party candidates since the second-term landslide election of President Franklin D. Roosevelt in 1936.

Factors external to West Virginia's ballot access laws have doubtless impacted the extent to which independent and minor party candidates have sought and obtained a place on the general election ballot since 1937. Nonetheless, it is apparent from the historical data that the combination of a primary eve filing deadline and the forced choice pro-

visions are not solely responsible for the almost total lack of independent and minor party candidates on the general election ballot in the period between 1938 and 1980. Those very restrictions were in effect in the primary elections held in May of 1932 and May of 1936, when, respectively, thirty-two and twenty-four minor party candidates appeared on the general election ballot for state offices. It would thus appear that the dearth in candidates in the elections conducted between 1937 and 1980 is better explained by external events or the other limitations imposed by the legislature in 1937 with respect to the filing of declarations of candidacy, the payment of filing fees, the qualification of canvassers, the magisterial district restriction, and, with respect to independent candidates, the requirement of naming the political party that the candidate proposed to represent. Indeed, when the in-lieu-of-filing-fee and magisterial district restrictions were struck down by the West Virginia Supreme Court in its 1980 decision in *Manchin*, 270 S.E.2d 634, and the certificate nomination process was opened up to independent candidates, a significant resurgence in success is detectable.

Moreover, the observable increase in the presence of independent and minor party candidates since 1980 is not confined to those candidates who could file as late as August. In 1980 and 1982, five minor party candidates appeared on the ballot for either the state legislature or United States Congress, notwithstanding an early June filing deadline. By comparison, in 1984, when the filing deadline was suspended for all candidates, only one non-presidential candidate appeared on the ballot. The same number, one per year, appeared in 1990 and 1992 for state offices even though the filing deadline was in May, nearly a month earlier. Moreover, it is known that in 1992, a second independent candidate qualified for the state legislature, but withdrew, and three independent candidates and one minor party candidate suc-

United States Senate that year and a Libertarian Party candidate for the House of Representatives was qualified for a place on the ballot but the decision was made not to go forward with having his name placed on the ballot, (Supp.Stip. ¶ 3).

Inasmuch as there are numerous factors which influence success in gaining ballot access and the court has not been provided with stipulated information regarding state specific requirements, comparison of West Virginia's success rate with that of other states is of limited benefit.

ceeded in getting on the ballot for local elections. Indeed, aside from the Libertarian Party candidates for state offices in 1992, it is known only that two Socialist Party candidates tried but failed to qualify for access to the ballot. Thus, it cannot be said that under the current statutory framework, it is only rarely that an independent or minor party candidate succeeds in getting on the ballot when forced to meet a May primary eve filing deadline.

Additionally, it cannot be said with certainty that the August filing deadline for presidential candidates accounts for the resurgence in the number of candidates appearing on the ballot for the office of president, inasmuch as two presidential candidates were on the 1980 ballot when the filing deadline was early June. An equally plausible explanation for the increased success of presidential candidates in 1980 and the elections of 1984, 1988 and 1992 is the changes necessitated by the West Virginia Supreme Court's decision in *Manchin*, although one cannot ignore a slight correlation between success and an August filing deadline. The data starting in 1984 thus suggests that a May filing deadline imposes some burden on independent and minor party candidates. In addition, it is recognized that courts in other jurisdictions have found that a candidate's success in obtaining the requisite number of signatures after expiration of the prescribed time is evidence that the earlier filing deadline creates a burden which requires weighing the interests advanced by the state as justification for the burden. *New Alliance Party of Alabama v. Hand*, 933 F.2d 1568, 1574 (11th Cir.1991); *Bradley v. Mandel*, 449 F.Supp. 983, 986–87 (D.Md.1978). Thus, the experience of the Libertarian Party in 1992, where it met its signature requirement in August, but not in May, evidences a burden associated with the May filing deadline.

It may similarly be said that the prohibition against both signing a nominating certificate and voting in the primary hindered the ability of the Libertarian Party to garner the signatures necessary for Hess by the May primary eve filing deadline. It is reasonable to assume that many voters are reluctant to forego voting in the primary, particularly when the primary may be the decisive race for certain offices and their decision must in many instances be made before the positions of the major political party candidates are crystallized. Moreover, it is seen that of the signatures submitted on May 11, 1992, in support of Hess' candidacy, 4,355 were found to be valid. Had he been given credit for the 2,574 signatures invalidated because of violations of the forced choice provision, he would have had the 6,500 needed for the primary eve filing date. Accordingly, it follows that the forced choice provision appears to have hindered his ability to gain access to the ballot.

Nevertheless, the court cannot ignore the evidence showing that the Libertarian Party's own lack of diligence contributed to its failure to meet the May filing deadline. In that respect, it is conceded that Horton had no prior experience in coordinating a petition drive and that 2,574 of the 11,159 signatures (23%) submitted in May were invalidated solely because of the parties' agreement with respect to the failure of solicitors to inform those from whom they were seeking signatures that they could not both sign the petition and vote in the primary. Use of a coordinator with no experience, who apparently did not understand an essential aspect of the soliciting process, demonstrates a lack of diligence. A lack of diligence is further seen by comparing the Libertarian Party's validation rate with that of other candidates who succeeded in meeting the May filing deadline. Except for the Socialist Workers Party, the Libertarian Party's validation rate was thirty to forty percent lower than that of anyone else, a difference significant enough to indicate a lack of diligence.

In sum, the statistical data since 1937 does not show that West Virginia's current ballot access laws operate to freeze the status quo such that an independent or minor party candidate only rarely succeeds in gaining access to the ballot. Indeed, there is evidence that diligent non-presidential candidates have, in recent years, gained access to the ballot for state offices notwithstanding the forced choice provision and a May filing deadline. The court accordingly concludes that plaintiffs have demonstrated only a

slight burden, not a severe restriction that would require the state to narrowly draw its ballot access laws to advance a state interest of compelling importance. In the absence of a showing of severe restriction, the standard remains one of reasonableness as set forth in *Anderson. Burdick,* 504 U.S. at 432–33, 112 S.Ct. at 2063.

### C. *The State's Asserted Interests and Justification*

The Secretary of State asserts that the May primary eve filing deadline contained in section 3–5–24 serves the "important state interest in providing a fair election process to all candidates clamoring for support" by giving all candidates, whether they be independent, those of major parties, or those of minor parties, the same amount of time to win nomination for the general election and the same amount of time after the primary for voter assessment. (Def.'s Mem. at 21.) He contends that a post primary filing deadline for independent and minor party candidates would unfairly discriminate against major party candidates because it would subject candidates of the major parties to a longer period of public scrutiny. By way of example, the Secretary explains that under the present system, major party candidates are subject to pre-primary analysis, followed by approximately six months of public exposure for those who win nomination in the primary election. Requiring independent and minor party candidates to file their nominating certificates on the eve of the primary election subjects them to the same period of scrutiny, according to the Secretary, while extending the filing deadline to August would shield them from all but three months of voter evaluation. The Secretary thus concludes that the primary eve filing deadline is a "reasonable, nondiscriminatory restriction" justified by "the State's important regulatory interests" of ensuring a fair election to all candidates and maintaining the integrity of the election process by requiring independent and minor party candidates to demonstrate a modicum of support before gaining access to the general election ballot. (Def.'s Reply Mem. at 7, quoting *Burdick,* 504 U.S. at 432–36, 112 S.Ct. at 2063–64.

### D. *The State's Interest Measured against Plaintiffs' Burden*

To this point, the court has discussed West Virginia's ballot access laws in the context of both independent and minor party candidates. Indeed, plaintiffs' complaint seeks relief on behalf of independent candidates, as well as minor party candidates, and the parties have not distinguished between the two groups in their summary judgment submissions. Moreover, a review of the historical data would be incomplete without giving consideration to the success rate of both minor party and independent candidates. However, no independent candidate is a party to this action. Rather, this case is brought solely on behalf of a minor political party. It is thus distinguishable from *Cromer v. State of South Carolina,* 917 F.2d 819 (4th Cir. 1990).

In *Cromer,* the Fourth Circuit Court of Appeals was presented with an independent candidate's challenge to the portion of South Carolina's ballot access law that required independent candidates to file a "statement of candidacy" by March 30, a date which preceded the state's primary election for political parties. *Id.* at 820–21. Independent candidates were accordingly required to file a notice of candidacy on the same date as that required for "party primary candidates". *Id.* at 821. In reviewing Cromer's challenge, the Fourth Circuit distinguished the *Socialist Workers* litigation on the ground that the challenges in *Socialist Workers* were brought by minor party candidates, not independent candidates like Cromer. *Id.* at 822. With respect to independent candidates, the court concluded that primary election candidates and independent candidates are "unequal in a way which makes imposition upon them of equal burdens not equality of treatment." *Id.* at 824 (citing *Anderson,* 460 U.S. at 799–800, 103 S.Ct. at 1575–1576).

While *Cromer* speaks of the differences between "primary" candidates and "independent" candidates, the distinction is also applicable as between independent candidates on the one hand and, on the other hand, minor party candidates like plaintiffs who do not appear on the primary ballot even if their

petitioning drive is successful. Such minor party candidates nonetheless have the support of a party organization to offset the burden of an early filing deadline, one of the distinguishing factors deemed important by the court in *Cromer* in discussing the lack of equality between independent and primary candidates. *See id.* at 824. In balancing the state's asserted interest against the burden imposed by West Virginia's ballot access laws, the court accordingly does not address the constitutionality of West Virginia's statutory scheme insofar as it applies to independent candidates.

It is recognized that states have a valid interest in ensuring that the general election ballot contain the names of only those candidates who have demonstrated a modicum of support, an interest which is "generally sufficient to justify reasonable nondiscriminatory restrictions." *Socialist Workers*, 890 F.2d at 1306 (quoting *Anderson*, 460 U.S. at 788, 103 S.Ct. at 1569–70). The reasonableness of the totality of West Virginia's ballot access laws with respect to minor party candidates has already been established in the *Socialist Workers* litigation, which is controlling here in light of the plaintiffs failure to demonstrate a restriction of such severity that it must be justified by a compelling state interest. The burden imposed by West Virginia's forced choice provision in combination with the May primary eve filing deadline is offset by the relatively low number of signatures required (one percent of the vote cast for that office in the last preceding election), the absence of a restriction on the period of time within which to collect signatures, and the large pool of eligible voters who are historically available to sign the nominating petition because they do not vote in the primary election.[17] *Socialist Workers*, 696 F.Supp. 190.

It is important to note, in addition, that the primary eve filing deadline also serves to place all party candidates for state office on equal footing. Allowing some candidates to announce their interest only after the primary election would give them an advantage over those who have already made their intentions known and thus exposed themselves to the scrutiny of the public. In a day where negative campaigns are becoming common, a candidate entering the field late may have a significant advantage by shortening the period during which that candidate is exposed to the public. The primary eve filing deadline exposes equally to the public all party candidates who will appear on the general election ballot and serves the state's strong interest in treating all candidates equally.

In addition, requiring minor party candidates to file their nominating petitions on the eve of the primary election ensures that they garner a showing of support in the same time period during which candidates for the major parties are competing for votes. Unlike independent candidates, minor party candidates enjoy the support of a political organization with a developed platform. Their decision to run for office should, accordingly, not be dependent on the primary result. Instead, it can be presumed that minor party candidates, unlike independents, will make their decision to run for office and espouse their party's separate platform notwithstanding which major party candidates emerge from the primary and without regard to the issues emphasized by the major parties. Moreover, the primary eve filing deadline ensures that voters are exposed to the full field of party candidates and their political positions at the time of the primary election. Voters are accordingly in a position to vote more intelligently than could be done if only some party candidates were identified.

Although the evidence demonstrates that West Virginia's primary eve filing deadline imposes a slight burden on minor party access to the ballot, the state nonetheless provides them with reasonable access. Moreover, the primary eve filing deadline serves the important state interests of treating all party candidates and their supporters equally.

---

17. This court noted in *Socialist Workers* that in any given election year from 1948 to 1988, nearly one-half of West Virginia's registered voters did not vote in the primary and thus were in the available pool of signers. In 1992, 46% of the registered voters did not vote in the primary, leaving a pool of 417, 466 voters from which Hess needed only approximately 6,500 signatures in order to qualify by the May filing deadline. (Stip. at ¶¶ 22, 49.)

For the reasons stated, the court concludes that the primary eve filing deadline for the filing of certificates of nomination in support of minor party candidates for public offices other than president and vice president as set forth in West Virginia Code, section 3–5–24, is a reasonable restriction on plaintiffs' constitutionally protected voting and political association rights. It is accordingly ORDERED that plaintiffs' motion for summary judgment be, and the same hereby is, denied and that the defendant's cross motion for summary judgment be, and the same hereby is, granted.

The Clerk is directed to forward copies of this order to all counsel of record.